**ASSOCIATED GENERAL CONTRACTORS OF MASSACHUSETTS, INC., et al., Plaintiffs-Appellants.**

v.

**Alan ALTSHULER et al., Defendants-Appellees.**

**No. 73–1250.**

United States Court of Appeals, First Circuit.

Heard Oct. 2, 1973.

Decided Nov. 30, 1973.

Certiorari Denied April 22, 1974. See 94 S.Ct. 1971.

James J. O'Leary, Boston, Mass., with whom Joseph P. Rooney, Ansel B. Chaplin, Gaston, Snow, Motley & Holt, Boston, Mass., and James E. Flynn, Jr., Cambridge, Mass., were on brief, for plaintiffs-appellants.

Dennis L. Ditelberg, Asst. Atty. Gen., and Gershon M. Ratner, Boston, Mass., with whom Robert H. Quinn, Atty. Gen., John F. Houton, Asst. Atty. Gen., Michael J. Hoare, Sp. Asst. Atty. Gen., Benjamin Jones, and Robert City, Boston, Mass., were on brief, for defendants-appellees.

Robert T. Moore, Atty., Dept. of Justice, with whom William J. Kilberg, Sol. of Labor, J. Stanley Pottinger, Asst. Atty. Gen., James N. Gabriel, U. S. Atty., and David L. Rose, Atty., Dept. of Justice, were on brief, for The Secretary of Labor of The United States, amicus curiae.

Jerry Cohen, Morris Shubow, John Henn, John Reinstein, Matthew Feinberg, Charles A. Levin, Mark A. Michelson, and Stephen R. Moore on brief for Civil Liberties Union and American Jewish Congress, New England Region, amici curiae.

Before COFFIN, Chief Judge, MOORE* and McENTEE, Circuit Judges.

COFFIN, Chief Judge.

This is an appeal from a judgment sustaining, as constitutional and in accord with state law, certain contract requirements imposed by the Commonwealth of Massachusetts upon contractors engaged in publicly funded construction work at Boston State College. Appellants are thirteen individual construction companies, now engaged in construction of public buildings for the Commonwealth, and a membership corporation comprised of one hundred forty-five general contracting firms which together perform approximately eighty per cent of all construction in the Commonwealth. Each of the appellants was a prospective bidder for the Boston State College contract.

In relevant part, § 1B of the contract requires that the contractor

". . . maintain on his project, which is located in an area in which there are high concentrations of minority group persons, a not less than twenty percent ratio of minority employee man hours to total employee man hours in each job category . . . ."

Section V, ¶ 3, of the contract provides, however, that the contractor must hire only "competent" workers. The Secretary of Transportation and Construction for the Commonwealth, who is charged with enforcing the contract provisions, interprets this to mean that § 1B requires the hiring of only "qualified" workers. The district court has interpreted the contract in the same way.

The contract also requires that the contractor engage in special referral procedures as well as traditional referral methods, cooperate with a Liaison Committee composed of various representatives from community groups, make weekly compliance reports to the Liaison Committee and the Massachusetts Commission Against Discrimination (M.C.A.D.), and permit the M.C.A.D. access to books, records, and accounts containing employment information.

The contract further stipulates that the M.C.A.D. will investigate any alleged non-compliance with the contract terms and notify the contractor of both its findings and recommendations as to how he might comply with the terms. If the contractor fails to accept the recommendations and in addition the M.C.A.D. determines that the contractor has not taken "every possible measure to achieve compliance", the M.C.A.D. will report its findings to the Bureau of Construction and recommend that specific sanctions be imposed. Before imposing any sanctions, however, pursuant to the Commonwealth's Administrative Procedures Act,

---

* Of the Second Circuit, sitting by designation.

M.G.L.A. c. 30A §§ 10, 11, and according to the Secretary of Transportation and Construction, the Bureau will provide the contractor with notice of the findings and a hearing in which he may challenge them.

Because the federal government pays a portion of the construction costs of the Boston State project, contractors are also required to accept federal bid conditions, promulgated by the United States Secretary of Labor pursuant to § 201 of Executive Order No. 11246 (30 F.R. 12319, as amended, 32 F.R. 14303; 34 F.R. 12985) and 41 C.F.R. 60. The specific contractual elements of the federal bid conditions are derived from the Boston Area Construction Program (the Boston Plan), a "hometown" equal employment opportunity plan prepared by the local construction industry in cooperation with the Department of Labor. Unlike the Commonwealth's § 1B, the federal Boston Plan sets area-wide percentage objectives for minority hiring within each trade, rather than percentage goals for each project. Under the Boston Plan the responsibility for fulfilling the objectives does not lie with the individual contractor; he merely agrees to hire whatever minority workers are referred to him by the trades unions in the course of the plan's operation. Moreover, while § 1B requires that contractors take "every possible measure" to comply with the contract terms, the Boston Plan necessitates merely a "good faith" effort by the contractor. A fourth point of difference between the two plans is that the Boston Plan places the burden of proving noncompliance upon the government agency, while § 1B places the burden of proving compliance, once non-compliance has

been alleged, upon the contractor himself.

Appellants challenge the constitutionality of § 1B of the contract requirements imposed by the Commonwealth on three grounds: They contend, first, that § 1B varies so significantly from the federal bid conditions of the Boston Plan that it violates the Supremacy Clause of Article VI; second, that § 1B imposes a fixed racial hiring quota which violates the Equal Protection clause of the Fourteenth Amendment; and finally, that § 1B permits the imposition of sanctions without proper notice or an opportunity to be heard, in violation of the Due Process clause of the Fourteenth Amendment. Appellants also contend, pursuant to the pendent jurisdiction of this court, that § 1B involves the M.C.A.D. in activities which go beyond the scope of its enabling legislation.

## I

In order to deal with appellants' first contention, that § 1B violates the Supremacy Clause because the federal Boston Plan must necessarily preempt § 1B, it is necessary to set out the context in which this case arises.

We note at the outset that the construction industry has been particularly slow, throughout the nation, to open itself to racial minorities.[1] For this reason, in 1967 the federal government launched pilot plans in several cities designed to increase minority employment on federally funded construction projects by way of "affirmative action" programs. Executive Order 11246,[2] under which the Secretary of Labor was authorized to promulgate such programs,[3] re-

---

1. See Marshall, The Negro and Organized Labor, 118–28 (1965); Hill, The Racial Practices of Organized Labor: The Contemporary Record, in The Negro and the American Labor Movement 313–314 (J. Jacobson, ed., 1968).

 As of May 19, 1970, only 11.8% of the 1.1 million members of the construction unions in America were members of racial minorities. The higher the skilled union, the smaller the percentage of minority workers

becomes: 38.3% of construction laborers are members of racial minorities, while 5.1% of electrical workers, and 2.1% of plumbers. Equal Employment Opportunity Commission Release No. 70–15 (May 19, 1970).

2. 30 Fed.Reg. 12319, as amended 32 Fed.Reg. 14303.

3. Under the Secretary of Labor's regulations, the Director of the Office of Contract Compliance (O.F.C.C.) has full authority to im-

quired that contractors "take affirmative action to ensure that applicants are employed . . . without regard to race . . . ." Affirmative action itself was defined as "specific steps to guarantee equal employment opportunity keyed to the problems and needs of members of minority groups, including, when there are deficiencies, the development of specific goals and time tables . . . ." [4]

After several different affirmative action programs had been implemented, with varying degrees of success,[5] in 1970 the government permitted particular communities to develop their own "hometown" affirmative action programs.[6] If the Secretary of Labor approved the plans,[7] the plans would receive federal funding, and local contractors who complied with them would thereby comply with the mandate of Executive Order 11246.[8]

The Boston Plan emerged from negotiations between representatives of buildings trades unions, contractors, and minority communities in the Boston area, and was approved by the Secretary of Labor in the fall of 1970. Although it fulfilled its first year goal of training and placing three hundred sixty minority workers, relationships with the minority community representatives deteriorated to the extent that the Department of Labor withheld second year funding until a revised plan could be negotiated. The new plan, beginning operations in January, 1972, did not have the participation of representatives of Boston's minority communities.[9] In addition, although put into effect two years after the original Boston Plan had commenced, the revised plan retained the same minority employment goal as that of the original plan.

At about the same time as the revised Boston Plan was put into effect, the Commonwealth began an inquiry of its own into the need for a separate state affirmative action program. The inquiry revealed that despite the existence of the federal Boston Plan, minority membership in all of the nineteen participating unions amounted to less than four per cent of union membership, while minorities comprised approximately twenty-three per cent of the population of Boston. Since virtually all of the contractors who engage in state funded projects rely upon these predomi-

plement the policies of the Secretary. Thus, the position of the O.F.C.C. is analogous to that of the Commonwealth's Bureau of Construction.

4. 41 C.F.R. § 60.-1.40(a) (Supp.1970).

5. Plans have been promulgated for Philadelphia, Washington, D.C., St. Louis, Atlanta, and Camden, N.J. See 41 C.F.R. 60.5, 60.6, 60.8, and 38 F.R. 21533 (Aug. 10, 1973). Such "imposed" plans operate only on the contractors; they do not require, and typically do not have, the cooperation of the unions involved.

6. There are now approximately forty-seven hometown plans finally approved by the O.F.C.C., including approximately twenty-nine federally funded training programs.

7. The O.F.C.C. determines the adequacy of the hometown plan by considering such factors as (1) the minority population of the area to be covered by the plan; (2) the minority manpower utilization in the industry (on a trade by trade basis); (3) the availability of minorities for employment; (4) the need and availability of training programs; and (5) the projected growth and attrition factors of the area industry in the near future.

8. For any trades or contractors not participating in the hometown plan, Part II of the federal bid conditions sets forth mandatory affirmative action requirements for each individual contractor, generally paralleling those of the hometown plan. The principal distinction with respect to Parts I and II of the bid conditions is that the obligations under Part II are individual obligations that run to a contractor's own work forces, with each contractor responsible for its own training program. Under Part I (the hometown plan), the minority hiring goals are obligations of the trade, and it is the administrative committee of the hometown plan that assigns fair share goals to the individual contractors.

9. The United States Department of Labor is now funding a subcontract with the Recruiting and Training Program (formerly the Workers Defense League), a minority organization which is providing recruiting, training, and referrals for the Boston Plan.

nantly white unions for workers, minority employment in the construction trades continued to be extremely low. The Commonwealth also determined that the Boston Plan had no provision for the collection of reliable data on the actual number of hours worked by minority workers placed on construction jobs. Finally, in the opinion of the Commonwealth's Office of Transportation and Construction, the Boston Plan lacked adequate enforcement machinery.[10] On the basis of these findings the Commonwealth concluded that the federal Boston Plan had not gone far enough, and that a separate, state affirmative action program was required for construction projects in which state funds were committed.

The contract for the construction of Boston State College is the first to incorporate both the Commonwealth's own § 1B bid conditions, promulgated under authority of the Governor's Executive Order No. 74, and the federal Boston Plan bid conditions. The Assistant Secretary of Transportation and Construction for the Commonwealth has determined that there exist adequate journeymen, apprentices, and trainees within Boston's minority community to provide at least twenty per cent of the work force for the project, as well as for other projects anticipated in the area.[11] It is estimated that the total work force required for the Boston State Project will vary between forty-seven and one hundred fifty persons; contractors on the project must therefore take "every possible measure" to employ between ten and thirty qualified minority workers.

Appellants contend that because the Commonwealth's § 1B affirmative action program places different requirements upon contractors than those of the Boston Plan, the two are in conflict, and

that the state plan must therefore be declared invalid. Appellants point out, most particularly, that under § 1B, contractors must bear the burden of showing that they have taken "every possible measure" to comply, whereas under the Boston Plan, they must have made merely a "good faith effort" and the burden of showing non-compliance rests with the government agency. They also stress that the record keeping and referral requirements of § 1B are more onerous than those of the Boston Plan.

In deciding whether state regulations should be invalidated because they conflict with federal law, courts have tended to examine both the possibility of broad conflict in "purposes and objectives" between the two schemes, Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1940), and the likelihood of specific conflict in the implementation of the two programs.

Clearly, the broad purposes which lay behind the federal Boston Plan and the Commonwealth's § 1B are congruent. Affirmative action, defined in the President's Executive Order as ". . . steps to guarantee equal employment . . . including . . . the development of specific goals and time tables . . . " has the same meaning as affirmative action as defined in the Governor's Executive Order: ". . . positive and aggressive measures to insure equal opportunity." Both plans envisage minority hiring goals as a means of achieving equal opportunity.

Nothing in the President's Executive Order requires that affirmative action taken under the Order be uniform throughout the country, nor does it necessitate that the federal government be the source for every program. An important aspect of federal implementation is the development of "hometown" plans,

---

10. The Commonwealth was also of the view that it is desirable to concentrate minority employment in the trade in projects in or near minority neighborhoods. Thus, the Commonwealth contends that its plan is not designed simply for the purpose of increasing minority employment but also for alter-

ing the geographic distribution of placements.

11. The district court found that the minority populations of neighborhoods in which the Commonwealth's plan is to be applied is approximately 40%.

conceived and developed by local contractors, unions, and minority representatives. And in at least one instance the federal government has relied upon a plan originally conceived by state officials for their own state funded contracts. *See* Illinois Builders Ass'n v. Ogilvie, 327 F.Supp. 1154 (S.D. Ill. 1971), aff'd, 471 F.2d 680 (7th Cir. 1972).

█ Nor is there any indication that the federal government has intended to preempt this field. Federal preemption should not be presumed, absent "a clear manifestation of intention" to preempt the field. Schwartz v. Texas, 344 U.S. 199, 202–203, 73 S.Ct. 232, 97 L.Ed. 231 (1952); *see also* New York State Department of Social Service v. Dublino, 405 U.S. 413, 93 S.Ct. 2507, 37 L.Ed.2d 688 (1973). The President's Executive Order merely requires that contractors take some "affirmative action" and directs the Secretary of Labor to "use his best efforts" through "state and local agencies" as well as federal agencies. The Secretary of Labor has stated, as amicus curiae, that the federal program is not meant to preempt state programs such as the Commonwealth's § 1B. And congressional policy in this area, as expressed in Title VII of the Civil Rights Act of 1964, the statute most closely analogous to the President's Executive Order, is clearly one of encouraging state cooperation and initiative in remedying racial discrimination. Title VII, 42 U.S.C. § 2000h–4 expressly disclaims any intent to preempt state action. *See also* Voutsis v. Union Carbide, 452 F.2d 889 (2d Cir. 1971), cert. denied, 406 U.S. 918, 92 S.Ct. 1768, 32 L.Ed.2d 117 (1971).

█ Even if there is no conflict between the purposes and objectives of the two schemes, the state plan might still be invalid if there is a showing of "such actual conflict between the two schemes of regulation that both cannot stand in the same area . . . ." Florida Lime and Avocado Growers, Inc. v. Paul, 373 U.S. 132, 141, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963); *see also* Perez v. Campbell, 402 U.S. 637, 649–653, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971). While we acknowledge that § 1B may be more demanding than the Boston Plan, and may well involve higher administrative costs, there is no reason to suppose that contractors could not comply with both at the same time. By complying with § 1B's minority hiring goals on projects funded by both the state and the federal government, contractors would also comply with the Boston Plan's goals. The reporting requirements are different for the two plans, but this merely necessitates the filing of two different sets of reports.

The only place where the two plans might be found slightly incompatible is in the area of trade union referrals. Recognizing that union reluctance to admit minorities to apprenticeship programs has been one primary reason for the small percentage of minorities in the construction trades,[12] the Boston Plan focusses upon encouraging areawide minority recruitment into the unions, and therefore does not alter the patterns of contractor reliance upon the unions for referrals. The Commonwealth's § 1B, however, facilitates referrals from sources other than the unions by providing alternative mechanisms for recruiting minority workers.

We think, however, that there is little likelihood that § 1B would discourage union initiative in training and recruiting minorities. The Commonwealth's program will operate on a small scale, only within neighborhoods with a high minority population; the contractors for the Boston College project are required to employ approximately thirty minority workers. The federal Boston Plan is designed to train and place three hundred sixty minority workers each year drawn from all over the state. Therefore, de-

---

12. *See* Employment and Manpower Problems in the Cities: Implications of the Report of the National Advisory Commission on Civil Disorders, Hearing Before the Joint Economic Comm., 90th Cong., 2d Sess. at p. 38 (1968).

spite the Commonwealth's program, buildings trades unions will be obligated to continue their efforts at recruiting minority workers and referring them to contractors. Furthermore, the Commonwealth's program does not prohibit union referrals. It merely provides other sources for referrals. Thus, § 1B might actually induce a stepped-up program of union recruitment if the unions are desirous of maintaining contractor reliance upon union referrals.

■ We conclude, therefore, that § 1B presents no challenge to the Supremacy Clause.

## II

Appellant's second contention, that the Commonwealth's § 1B imposes a fixed racial hiring quota which violates the Equal Protection clause of the Fourteenth Amendment, presents a more difficult issue, the implications of which stretch far beyond this particular dispute.

The first Justice Harlan's much quoted observation that "the Constitution [is colorblind] . . . [and] does not . . . permit any public authority to know the race of those entitled to be protected in the enjoyment of such rights", Plessy v. Ferguson, 163 U.S. 537, 554, 16 S.Ct. 1138, 1145, 41 L.Ed. 256 (1896) (dissenting opinion) has come to represent a long-term goal. It is by now well understood, however, that our society cannot be completely colorblind in the short term if we are to have a colorblind society in the long term. After centuries of viewing through colored lenses, eyes do not quickly adjust when the lenses are removed. Discrimination has a way of perpetuating itself, albeit unintentionally, because the resulting inequalities make new opportunities less accessible. Preferential treatment is one partial prescription to remedy our society's most intransigent and deeply rooted inequalities.

Intentional, official recognition of race has been found necessary to achieve fair and equal opportunity in the selection of grand juries, Brooks v. Beto, 366 F.2d 1 (5th Cir. 1966); tenants for public housing, Otero v. New York City Housing Authority, 484 F.2d 1122 (2d Cir. 1973); Norwalk CORE v. Norwalk Redevelopment Agency, 395 F.2d 920 (2d Cir. 1968); Gautreaux v. Chicago Housing Authority, 304 F. Supp. 736 (N.D. Ill. 1969); school administrators, Porcelli v. Titus, 431 F.2d 1254 (3d Cir. 1970); and children who are to attend a specific public school, Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).

The intentional, official recognition of race in the selection of union members or construction workers has been constitutionally tested and upheld in two contexts. The first is where courts have ordered, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(g), remedial action for past discrimination. In fulfilling their "duty to render a decree which will so far as possible eliminate the discriminatory effects of the past . . .", Louisiana v. United States, 380 U.S. 145, 154, 85 S.Ct. 817, 822, 13 L.Ed.2d 709 (1965), courts have ordered unions to grant immediate membership to a number of minority applicants, United States v. Wood, Wire, and Metal Lathers International Union, Local No. 46, 471 F.2d 408 (2d Cir. 1973), cert. denied, 412 U.S. 939, 93 S.Ct. 2773, 37 L.Ed.2d 398 (1973); to begin an affirmative minority recruitment program, United States v. Sheet Metal Workers International Ass'n, Local No. 36, 416 F.2d 123 (8th Cir. 1969); to match normal referrals with minority referrals until a specific objective has been obtained, Heat and Frost Workers, Local 53 v. Vogler, 407 F.2d 1047 (5th Cir. 1969); or to take on a certain number of minority apprentices for each class of workers, United States v. Ironworkers Local 86, 443 F.2d 544 (9th Cir. 1971), cert. denied, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971). Courts have also ordered employers to hire minority employees up to thirty per cent of the total work force, Stamps v. Detroit Edison, 365 F.Supp.

87 (E.D. Mich. 1973); to hire one minority worker every time two white workers were hired, up to a certain number, Carter v. Gallagher, 452 F.2d 315 (8th Cir. 1971), cert. denied, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972); and in our own Castro v. Beecher, 459 F.2d 725 (1972), we order that black and Spanish-speaking applicants for police positions, who had failed to measure up to a constitutionally impermissible set of hiring standards, be given priority in future hiring.

The second context in which race has been recognized as a permissible criterion for employment is where courts have upheld federal affirmative action programs against challenges under the Equal Protection clause or under the anti-preference provisions of Title VII of the Civil Rights Act of 1964, 42 U.S. C. § 2000e–2(j). Recognizing that the discretionary power of public authorities to remedy past discrimination is even broader than that of the judicial branch, see Swann v. Charlotte-Mecklenburg, supra at 16 of 402 U.S., 91 S.Ct. 1267; cf. Katzenbach v. Morgan, 384 U.S. 641, 653, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966), courts have upheld the specific percentage goals and time tables for minority hiring found in the Philadelphia Plan, Contractors Ass'n of Eastern Pennsylvania v. Secretary of Labor, 311 F.Supp. 1002 (E.D. Pa. 1970), aff'd, 442 F.2d 159 (3d Cir. 1971), cert. denied, 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971), the Cleveland Plan, Weiner v. Cuyahoga Community College District, 19 Ohio St.2d 35, 249 N.E.2d 907, 908 (1969), cert. denied, 396 U.S. 1004 (1970), the Newark Plan, Joyce v. McCrane, 320 F.Supp. 1284 (D. N.J. 1970), and the Illinois Ogilvie Plan, Southern Illinois Builders Ass'n v. Ogilvie, 327 F. Supp. 1154 (S.D. Ill. 1971), aff'd, 471 F.2d 680 (7th Cir. 1972).

Despite ample precedent for using race as a criterion of selection where the goal is equal opportunity, we approach its use in the present case with care. This marks the first time, to our knowledge, that a court has been asked to sanction a plan for hiring a specific percentage of minority workers that requires an employer to take "every possible measure" to reach the goal on each job site, and places upon him the burden of proving compliance, under threat of serious penalties if that burden is not sustained. It is but a short step from these requirements to a demand that an employer give an absolute percentage preference to members of a racial minority, regardless of their qualifications and without consideration for their availability within the general population. The Commonwealth's affirmative action plan forces us to address a fundamental question: are there constitutional limits to the means by which racial criteria may be used to remedy the present effects of past discrimination and achieve equal opportunity in the future?

There are good reasons why the use of racial criteria should be strictly scrutinized and given legal sanction only where a compelling need for remedial action can be shown. Norwalk CORE v. Norwalk Redevelopment Agency, 395 F. 2d 920, 931–932 (2d Cir. 1969). Government recognition and sanction of racial classifications may be inherently divisive, reinforcing prejudices, confirming perceived differences between the races, and weakening the government's educative role on behalf of equality and neutrality.[13] It may also have unexpected results, such as the development of indicia for placing individuals into different racial categories. Once racial classifications are imbedded in the law, their purpose may become perverted: a benign preference under certain conditions may shade into a malignant preference at other times.[14] Moreover, a ra-

---

13. See Kaplan, Equal Justice in an Unequal World: Equality for the Negro—The Problem of Special Treatment, 61 Nw.U.L.Rev. 363 (1966).

14. For example, a preference for induction into the armed services might appear to some to be a positive opportunity for training and steady work, yet might also appear

cial preference for members of one minority might result in discrimination against another minority, a higher proportion of whose members had previously enjoyed access to a certain opportunity.

In the present instance, there is no question that a compelling need exists to remedy serious racial imbalance [15] in the construction trades, particularly in Roxbury, Dorchester, and South End, where minorities constitute approximately forty per cent of the population, and yet only about four per cent of the membership of buildings trades unions, and where there has been a long history of racial discrimination in those unions. Such an imbalance within the relatively lucrative, highly visible, and expanding construction trades undermines efforts at achieving equal opportunity elsewhere in the economy, and contributes to racial tensions.[16]

Even where a long history of discrimination and continuing racial imbalance compels the remedial use of racial criteria, however, the means chosen to implement the compelling interest should be reasonably related to the desired end. *See* Contractors Ass'n of Eastern Pennsylvania v. Secretary of Labor, *supra*, 311 F.Supp. at 1011; *cf.* McLaughlin v. Florida, 379 U.S. 184, 193, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964). A program which included unrealistic minority hiring goals might impose an unreasonable burden on the employer and upon qualified workers who were denied jobs because they were not members of the ra-

cial minority. Unrealistically high goals are likely, in addition, to forment racial tensions and to prompt employers to circumvent the rules.

A program of affirmative action might be considered to impose unrealistic and unreasonable hiring goals if it included a racial preference that could not be fulfilled, or could be fulfilled only by taking on workers who were unqualified for the trainee, apprentice, or journeyman status for which they were hired. Equal opportunity is an elusive concept, but at its core it carries the simple mandate that opportunities should be open to all on the basis of competence alone. Thus, it would be consistent with the goal of equal opportunity to give first priority to members of a minority that had previously been denied equal opportunity, if those members were otherwise as qualified as were qualified members of the majority population. In order that this special treatment be meaningful, of course, there should be equal opportunity to gain the training necessary to qualify.[17]

While § 1B says nothing about hiring "qualified" minority workers, § V, ¶ 3 of the same contract requires that the contractor hire only "competent" workers. The district court has interpreted § 1B in light of § V, ¶ 3, to require that the twenty per cent minority employees of § 1B be "qualified" for the status to which they were assigned. The Commonwealth's Secretary of Transportation and Construction, who is charged with implementing these provisions, has interpreted § 1B in the same way.

---

at other times or to other people to be a somewhat negative opportunity.

15. Based upon information revealed in the depositions of several union officials, and other statistical information such as the "Equal Employment Opportunity Local Union Reports", the district court concluded that racial imbalance does exist in the Boston construction trades and such imbalance is the result of past discriminatory practices on the part of many "entities" in that industry. Such inferences from statistical showings of racial imbalance are permitted. *See*, *e. g.*, Carter v. Gallagher, 452 F.2d 315, 323

(8th Cir. 1971); Parkham v. Southwestern Bell Telephone, 433 F.2d 421, 426 (8th Cir. 1970); Jones v. Lee Way Motor Freight, 431 F.2d 245, 247 (10th Cir. 1970).

16. If, at some future time, racial balance were to be achieved in Boston's construction trades, we assume that there would no longer exist a compelling need for remedial action, and the use of such racial criteria would no longer be warranted.

17. Thus, presumably, to be "qualified" for a training program would require less competence than to be "qualified" for apprenticeship or journeyman status.

Appellants maintain, however, that the goal of twenty per cent minority workers on each construction site, combined with the contractor's burden of proving that he has taken "every possible measure to achieve compliance" with the goal, will necessarily move the contractor to hire unqualified minority workers, rather than run the risk of incurring sanctions. While we think that this is an unwarranted concern, given that the Boston State College project will require approximately thirty minority workers, we concede that, in principle, a high percentage goal for minority hiring combined with a high burden of proving compliance might create the likelihood that unqualified workers would be hired.

■ Despite the fact that the Secretary of Transportation and Construction alleges that the twenty per cent goal was based upon an assessment of current availability of minority journeymen, apprentices, and trainees, courts are ill equipped to judge the accuracy of such assessments. It becomes important, therefore, that affirmative action plans, such as the Commonwealth's § 1B, contain fair procedures for contractors to make a showing that insufficient qualified minority workers are available. Thus, any reasonable program designed to remedy racial imbalance must incorporate the necessary elements of due process. So long as contractors receive notice and a meaningful opportunity to challenge any allegations of non-compliance and prove that they have taken whatever efforts are required of them to comply, it is less important that a particular percentage goal might be slightly optimistic or unrealistic, given current availability of qualified minority workers.

Appellants' contention that § 1B violates the Equal Protection clause is therefore intimately tied to their contention that § 1B, in violation of the Due Process clause, permits the imposition of sanctions without proper notice or an opportunity to be heard, an issue to which we now turn.

III

Appellants' due process claim concerns § 1B.2 of the contract provisions, which sanctions listed below . . . . [T]he Commission (M.C.A.D.) shall make a final report of non-compliance, and recommend to the Bureau [of Construction] the imposition of one or more of the sanctions listed below . . . . [T]he Bureau shall impose one or more of the following sanctions, as it may deem appropriate . . . ."

The M.C.A.D.'s determination of non-compliance is made *ex parte*. Contractors are notified of the findings and given an opportunity to take specific steps which would, in the opinion of the M.C.A.D., bring them into compliance, but contractors are not permitted to challenge the findings of non-compliance at this juncture.

The Bureau of Construction is required, pursuant to the Commonwealth's Administrative Procedure Act, M.G.L.A. c. 30A §§ 10, 11, to hold a hearing before any penalties may be imposed on the contractors for non-compliance. What is in dispute is the scope of this hearing. Appellants maintain that § 1B.2 allows, at most, a challenge to the particular sanction which the M.C.A.D. has recommended, in favor of what might be contended to be a more appropriate sanction, but not a challenge to the truth of the M.C.A.D.'s basic findings of non-compliance. If appellants' interpretation of § 1B.2 were correct, their due process claim would have some merit because contractors would be subject to serious penalties, such as debarment from participation in state contracts for three years, without having had an opportunity to contest the findings on which the imposition of the penalty was based. *See* Boddie v. Connecticut, 401 U.S. 371, 377–379, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971); *cf.* Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); Sniadach v. Family Finance Corp., 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969).

We do not think, however, that § 1B.2 must necessarily be interpreted to re-

quire such a narrowing of the scope of the administrative hearing. The contract states that the Bureau "shall impose" one of the sanctions only "as it may deem appropriate to attain full and effective enforcement." It would seem perfectly consistent with this mandate for the Bureau to determine for itself that the contractor had in fact taken "every possible measure" to achieve compliance, despite the findings of the M.C.A.D. to the contrary, and that any sanction would be inappropriate. The presumption of constitutionality customarily accorded state statutes, e. g., United States v. Carolene Products, 304 U.S. 144, 152, 58 S.Ct. 778, 82 L.Ed. 1234 (1938), would dictate that we apply this interpretation. The Supreme Judicial Court of Massachusetts has, moreover, construed certain other Commonwealth statutes, facially lacking express provisions for notice and hearing, as impliedly calling for such due process requirements. *See* Rohrer, Petitioner, 353 Mass. 282, 230 N.E.2d 915 (1967); O'Leary, Petitioner, 325 Mass. 179, 89 N.E.2d 769 (1950).

■ The Commonwealth's Secretary of Transportation and Construction has given the foregoing interpretation to § 1B.2, and has stipulated that no sanctions may be imposed against a contractor until he has had a full hearing before officials of the Bureau of Construction in which he may challenge any findings of non-compliance by the M.C.A.D. Since the Secretary is entrusted with interpretation and implementation of the contract privisions, his view is at least entitled to "respectful consideration", Fox v. Standard Oil Co., 294 U.S. 87, 96, 55 S.Ct. 333, 79 L.Ed. 780 (1935). We see no reason not to accept his interpretation in this case, Law Students Research Council v. Wadmond, 401 U.S. 154, 162, 91 S.Ct. 720, 27 L.Ed.2d 749 (1971), and indeed condition our holding on the consistent application of this interpretation. We conclude, therefore, that § 1B so construed does not violate the Due Process clause of the Fourteenth Amendment.

■ Since contractors are provided with notice and a full opportunity to contest allegations of non-compliance, they may thereby show that insufficient qualified minority workers were available. Therefore, in light of our preceding analysis, we find that § 1B does not violate the Equal Protection clause of the Fourteenth Amendment.

IV

■ Appellants' final contention, which comes within the compass of our pendent jurisdiction, is that the Commonwealth's § 1B program involves the M.C.A.D. in activities that are prohibited by the anti-preference clause of M.G.L.A. c. 151B, § 4. This clause provides, in relevant part that " . . . nothing contained in this chapter or in any rule or regulation issued by the Commission [M.C.A.D.] shall be interpreted as requiring any employer, employment agency or labor organization to grant preferential treatment to any individual or to any group because of the race . . . of such individual or group . . . ."

The anti-preference clause has not been interpreted by Massachusetts courts. The district court determined, however, that the statute is inapplicable to activities of the M.C.A.D. carried on pursuant to § 1B for two reasons. The first is that the anti-preference clause applies only to regulations issued by the M.C.A.D., while under § 1B the M.C.A.D. merely investigates and makes recommendations under regulations promulgated by the Secretary of Transportation and Construction. The second reason is that, contrary to the assertions of appellants, the clause applies only to authority vested in the statute itself, while the authority for § 1B stems from the Governor's Executive Order No. 74 and from M.G.L.A. c. 6A § 24 and c. 149 § 44A, both of which provide for the acceptance or the rejection of bids. We agree with this analysis.

In addition, we would point to the way in which federal courts have dealt with the anti-preference provision of Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 2000e–2(j), which is analogous to the Commonwealth's anti-preference clause. In United States v. I.B.E.W. Local 38, 428 F.2d 144 (6th Cir. 1970), cert. denied, 400 U.S. 943, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970), the court construed that provision to mean that an employer was not required to grant preferential treatment to minorities merely because of racial imbalance on his work force, but that some preference might be required to remedy the present effects of past discrimination. "Any other interpretation would allow complete nullification of the stated purpose of the Civil Rights Act of 1964". *Id.* at 149–150. *See also* Carter v. Gallagher, *supra.*

It is undisputed that past racial discrimination in Boston's construction trades is in large part responsible for the present racial imbalance. Given this fact, we find it difficult to conceive that Massachusetts would interpret its own anti-preference provision in such a way as to prohibit programs designed to remedy that imbalance.

We conclude, therefore, that the Commonwealth's § 1B is violative of neither state law nor the federal Constitution.

Affirmed.