**BLACK VOTERS et al., Plaintiffs,**

v.

**John J. McDONOUGH et al., Defendants.**

**No. CA 75–812–T.**

United States District Court,
D. Massachusetts.

October 6, 1976.

Roger L. Rice, Cambridge, Mass., Margaret A. Burnham, Burnham, Stern & Shapiro, Boston, Mass., Liza Fitzgerald, Boston Legal Assistance Project, Boston, Mass., for plaintiffs.

Patricia C. Gunn, Asst. Atty. Gen., Boston, Mass., amicus curiae.

Kevin F. Moloney, Asst. Corp. Counsel, City Hall Law Dept., Marilyn Sticklor, Boston, Mass., for defendants.

Kline & Gordon, Joseph A. Gordon, Robert G. Kline, Boston, Mass., Louise Day Hicks, Boston City Council, Boston, Mass., Robert Emmet Dinsmore, Boston, Mass., for Boston School Committee.

TAURO, District Judge.

### INTRODUCTION

This is a class action brought by black registered voters of Boston, seeking declaratory and injunctive relief against Boston's Mayor, City Council, School Committee, Election Commissioners and City Clerk.[1]

---

1. The named plaintiffs in this case are Rose Jolley, Ruthanne Bracey, Janice Lee Emory, Ethel M. Thompson, Wyola Harding, Lorietta Burke, Shirley Payne, Bernadette McClain, Clyde Snow and Joan Tavares.

Defendants are John J. McDonough, Paul R. Tierney, Kathleen Sullivan, David Finnegan and Elvira Palladino, individually and as members of the Boston School Committee; Louise Day Hicks, Frederick C. Langone, Albert L.

The suit challenges the at-large voting procedure for election of members of the Boston School Committee.[2]

Plaintiffs claim that, due to a combination of circumstances, the at-large system effectively cancels out, dilutes and minimizes the voting strength of the Boston black community in School Committee elections. This, they say, deprives black residents of constitutional and statutory rights. They seek a declaration to this effect as well as injunctive relief.

The defendants disagree.[3] They claim, first of all, that this action is barred by the doctrines of res judicata or collateral estoppel. They also defend on the merits, denying that plaintiffs' voting power has been diluted or that they have been deprived of constitutional or statutory rights by the at-large system.

The court has jurisdiction over this matter under 28 U.S.C. §§ 1343(3) and 1343(4), and 42 U.S.C. §§ 1971(d) and 1973j(f) (The Voting Rights Act). The power of this court to issue injunctive relief is granted by 28 U.S.C. §§ 2201 and 2202. This action arises under 42 U.S.C. §§ 1971, 1973, 1981 and 1983, and the First, Thirteenth, Fourteenth and Fifteenth Amendments of the United States Constitution.

Hearings on the merits in this case consumed thirty days, during which time the court heard testimony from thirty-two witnesses, recorded in some 3400 pages of transcript. More than 200 exhibits were introduced.

Upon review of the evidence and the law, this court holds: 1) that the plaintiffs are not barred from bringing this suit by either res judicata or collateral estoppel and 2) that the deficiencies of the challenged at-large election system do not deprive plaintiffs of any constitutional or statutory right.

I

## RES JUDICATA AND COLLATERAL ESTOPPEL

On September 9, 1969, a complaint was filed in this district in the case of Owens, et al. v. School Committee of Boston, 304 F.Supp. 1327 (D.Mass.) The plaintiffs in that case alleged that Section 18 of the Boston City Charter, insofar as it provided for the at-large election of School Committee members, violated their constitutional rights. On November 4, 1969, plaintiffs' motion for a preliminary injunction was denied. Owens v. School Committee of Boston, 304 F.Supp. 1327 (D.Mass.1969).

O'Neil, Christopher A. Ianella, James Michael Connolly, Patrick F. McDonough, Joseph M. Tierney, Lawrence Di Cara and John J. Kerrigan, individually and as members of the Boston City Council; Honorable Kevin H. White, as Mayor of the City of Boston; Joseph W. Fitzgerald, Joseph D. Murphy, Perlie Dyar Chase and William McDermott, as members of the Board of Election Commissioners; and Joseph M. Dunlea as City Clerk for the City of Boston.

2. The procedure for election of members to the Boston School Committee, as established in 1875 and as modified in 1906, operates as follows. Section 18 of the Boston City Charter provides that: " . . . there shall be elected at-large five school committeemen, each to hold office for the two municipal years following the municipal year in which he is elected." St.1948, ch. 452, § 18, as amended by St.1951, ch. 376, § 1. Elections take place on the first Tuesday in November in odd-numbered years. Nominating petitions for candidates who wish to be placed on the ballot must be signed by 2000 registered voters. If valid petitions are submitted by more than ten candidates, a pre-

liminary election is held six weeks prior to the general election and the field is narrowed to the ten candidates receiving the most votes.

Section 18 does not require that the School Committee members reside in or represent any particular area of Boston. There is no majority-vote or "place" rule. In the final election voters may vote for one or more candidates, up to five. The five persons with the most votes are elected. The election is non-partisan. The at-large procedure is consistent with state policy. Mass.Gen.Laws ch. 43, § 31.

A survey in 1975 by the National School Board Association revealed that of the nation's fifty largest cities, thirty-two conduct their School Committee or School Board elections at-large.

3. At the outset of this suit, the Mayor and some members of the City Council did not contest plaintiffs' allegations, reserving only the right to be heard at the remedial stage of the case should the plaintiffs prevail. At final argument, however, Corporation Counsel made clear that all defendants oppose plaintiffs' suit on the merits.

Two and a half years later, in an unreported one-sentence order, Judge Ford allowed the defendant School Committee's motion to dismiss for failure to state a claim. *Owens v. School Committee of Boston,* CA 69–934–F (D.Mass. March 31, 1972). His decision was not appealed. It is this final judgment which the defendants claim bars the present action, either by operation of the doctrine of *res judicata* or by collateral estoppel.

■ Three prerequisites control the application of these two doctrines: 1) entry of a final judgment on the merits in the first action; 2) identity of the causes of action adjudicated (*res judicata*), or identity of the issues fully and fairly litigated (collateral estoppel), and 3) identity or privity of parties in the two actions. 1B J. Moore, Federal Practice ¶ 0.401, at 11 *et seq.; Lawlor v. National Screen Service Corp.,* 349 U.S. 322, 326, 75 S.Ct. 865, 99 L.Ed. 1122 (1955); *Mendez v. Bowie,* 118 F.2d 435, 440 (1st Cir.), *cert. denied,* 314 U.S. 639, 62 S.Ct. 76, 86 L.Ed. 513 (1941).

Analyzing *Owens* and the instant case, it is clear that Judge Ford's dismissal for failure to state a claim is a decision on the merits, satisfying the first prerequisite.

■ While the thrust of the complaint in *Owens,* as here, was a challenge to the at-large voting system, application of both *res judicata* and collateral estoppel may be limited when substantial shifts occur in the factual and legal underpinnings of a cause of action. *See, e. g., Chapman v. Meier,* 420 U.S. 1, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975); *Whitcomb v. Chavis,* 403 U.S. 124, 162–63,

91 S.Ct. 1858, 29 L.Ed.2d 363 (1971).[4] Important factual and legal developments have occurred during the seven years that have passed since the *Owens* decision. A 1974 referendum calling for a change in the challenged election procedure was defeated. This court and the Court of Appeals for the First Circuit have determined that there has been official *de jure* segregation of the Boston public schools,[5] and that they are racially imbalanced in violation of state law.[6] Boston's school children have been bused as part of a federal court-ordered integration program. Moreover, since *Owens,* the Supreme Court has substantially clarified the guidelines to be employed by district courts in weighing the merits of challenges to at-large voting systems. *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973).

Finally, the parties bringing this action are neither identical to, nor in privity with those in *Owens,* thus precluding application of either *res judicata* or collateral estoppel. No class was ever certified in *Owens.* As a result, the decision binds only the named plaintiffs and those in privity with them. *See, e. g., Board of School Commissioners of the City of Indianapolis v. Jacobs,* 420 U.S. 128, 95 S.Ct. 848, 43 L.Ed.2d 74 (1975); *Gonzales v. Cassidy,* 474 F.2d 67 (5 Cir. 1973); *Citizens for Community Action at the Local Level, Inc. v. Ghezzi,* 386 F.Supp. 1, 5–6 (W.D.N.Y.1974) *vacated on other grounds sub nom. Town of Lockport, New York v. Citizens for Community Action at the Local Level, Inc.,* 423 U.S. 808, 96 S.Ct. 11, 46 L.Ed.2d 24 (1975); *Paddison v. Fidelity Bank,* 60 F.R.D. 695, 697 (E.D.Pa.1973).

4. The application of collateral estoppel and *res judicata* may also be limited by the public's interest in having a prior decision re-examined in light of changed circumstances and conditions. *See Griffin v. State Board of Education,* 296 F.Supp. 1178, 1182 (E.D.Va.1969); *Chavis v. Whitcomb,* 305 F.Supp. 1364 at 1371 (S.D. Ind.1969), *rev'd on other grounds,* 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971); 1B J. Moore, Federal Practice ¶ 0.405(11) and (12), at 783 *et seq.* (2d ed.1974)

5. *Morgan v. Hennigan,* 379 F.Supp. 410 (D.Mass.), *aff'd sub nom. Morgan v. Kerrigan,*

509 F.2d 580 (1st Cir. 1974), *cert. den.,* 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975).

6. *See School Committee of Boston v. Board of Education,* 364 Mass. 199, 302 N.E.2d 916 (1973) (Boston III); *School Committee of Boston v. Board of Education,* 363 Mass. 125, 292 N.E.2d 870 (1973) (Boston II); *School Committee of Boston v. Board of Education,* 363 Mass. 20, 292 N.E.2d 338 (1973) (Boston I).

See also *Opinion of the Justices,* 365 Mass. 648, 310 N.E.2d 348 (1974); *Opinion of the Justices,* 363 Mass. 899, 298 N.E.2d 840 (1973).

This court, therefore, is not precluded by the decision in *Owens* from adjudicating this case on the merits.

## II

### LEGAL CONSIDERATIONS AFFECTING AT–LARGE ELECTION SYSTEMS

Two recent Supreme Court cases present detailed guidelines to be employed in assessing the constitutionality of at-large voting systems, *Whitcomb v. Chavis,* 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971) and *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973).

The plaintiffs in *Whitcomb* challenged, among other things, the at-large voting system for General Assembly seats in Marion County, Indiana. A three-judge panel determined that the challenged at-large system did violate the constitutional rights of Marion County blacks. In reaching this conclusion, the court found that an identifiable minority population existed within Marion County that had special and unique interests in various areas of substantive law, but whose voting strength had been minimized by a number of factors. One such factor was that the selection of candidates had been controlled by white dominated political parties, seriously limiting the opportunity of blacks to vote for prospective legislators who would be responsive to their needs. The court concluded that redistricting of Marion County was essential to remedy the situation and, further, that reapportionment of the entire state was needed to avoid an imbalance created by the redistricting of Marion County.

The Supreme Court reversed. The Court reemphasized each citizen's inalienable right to participate fully and effectively in the political processes of his or her state, including the election of legislators. Weighing the effect of multi-member districts on this right, the Court reiterated that such districts, though suspect and subject to challenge, are not, *per se,* unconstitutional.

> [Multi-member district systems] may be subject to challenge where the circumstances of a particular case may "operate to minimize or cancel out the voting strength of racial or political elements of the voting population." . . . But we have insisted that the challenger carry the burden of proving that multi-member districts unconstitutionally operate to dilute or cancel the voting strength of racial or political elements.

*Id.* 403 U.S. at 143–44, 91 S.Ct. at 1869, 29 L.Ed.2d at 376 [Citations omitted].

In coming to the conclusion that there were "major deficiencies" in the lower court's decision, the Supreme Court emphasized certain key factors:

1) The challenged multi-district system was not conceived or operated as a purposeful device to further discrimination.[7]

2) Absent evidence demonstrating less opportunity for them to participate in the political processes, the election of a disproportionately low number of ghetto residents as legislators, standing alone, did not prove invidious discrimination. Significant to the

---

**7.** The Supreme Court has suggested that, although a showing of invidious purpose would be highly relevant in any assessment of an election system's constitutionality, such showing is not a prerequisite to invalidation.

> [I]t might well be that, designedly or otherwise, a multi-member constituency apportionment scheme, under the circumstances of a particular case, would operate to minimize or cancel out the voting strength of racial or political elements of the voting population.

*Fortson v. Dorsey,* 379 U.S. 433, 439, 85 S.Ct. 498, 501, 13 L.Ed.2d 401 (1965).

The issue is whether the at-large system "was designed to or would operate" to dilute the voting strength of a cognizable racial or political minority. *Burns v. Richardson,* 384 U.S. 73, 89, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966). *But see Graves v. Barnes,* 378 F.Supp. 640, 667 *et seq.* (W.D.Tex.1974) (Wood, J., dissenting). *See also Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). It is not necessary for this court to reach the issue of whether deliberate intent to discriminate must be demonstrated. The court holds that, even assuming a deliberate purpose to discriminate need not be shown, plaintiffs have failed to carry their burden.

Court was the absence of any evidence that blacks in Marion County were not allowed to a) register, b) vote, c) choose a political party and participate in its affairs, including the selection of candidates.

3) The plaintiffs had not established that their interests diverged significantly from those of other citizens within the multi-member district, or that the special needs of the ghetto residents had been ignored by the elected representatives.

The Court observed that "the voting power of ghetto residents may have been 'cancelled out' as the District Court held, but this seems mere euphemism for political defeat at the polls." *Id.* 403 U.S. at 153, 91 S.Ct. at 1874.

> On the record before us plaintiffs' position comes to this: that although they have equal opportunity to participate in and influence the selection of candidates and legislators, and although the ghetto votes predominantly Democratic and that party slates candidates satisfactory to the ghetto, invidious discrimination nevertheless results when the ghetto, along with all other Democrats, suffers the disaster of losing too many elections. But typical American legislative elections are district-oriented, head-on races between candidates of two or more parties. As our system has it, one candidate wins, the others lose. Arguably the losing candidates' supporters are without representation since the men they voted for have been defeated; arguably they have been denied equal protection of the laws since they have no legislative voice of their own. This is true of both single-member *and* multi-member districts. But we have not yet deemed it a denial of equal protection to deny legislative seats to losing candidates, even in those so-called "safe" districts where the same party wins year after year.

*Id.*

The mere fact that one interest group or another concerned with the outcome of Marion County elections has found itself outvoted and without legislative seats of its own provides no basis for invoking constitutional remedies where, as here, there is no indication that this segment of the population is being denied access to the political system.

*Id.* 403 U.S. at 154–55, 91 S.Ct. at 1875.

While acknowledging that at-large systems did have many defects, the Court reaffirmed its prior decisions holding that multi-member districts were not necessarily unconstitutional.

> In our view, however, experience and insight have not yet demonstrated that multi-member districts are inherently invidious and violative of the Fourteenth Amendment. . . . The short of it is that we are unprepared to hold that district-based elections decided by plurality vote are unconstitutional in either single- or multi-member districts simply because the supporters of losing candidates have no legislative seats assigned to them.

*Id.* at 159–160, 91 S.Ct. at 1877.

The other major decision in this area is *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973). The relevant portions of that opinion examined the at-large voting procedure in two Texas state legislative districts, Dallas and Bexar Counties, which, the lower court had found, had unconstitutionally diluted the voting power of blacks and Mexican-Americans. In describing the standard to be applied in assessing the impact of multi-member districts on voting rights, the Court said:

> Plainly, under our cases, multimember districts are not *per se* unconstitutional . . . . But we have entertained claims that multimember districts are being used invidiously to cancel out or minimize the voting strength of racial groups. . . . To sustain such claims, it is not enough that the racial group allegedly discriminated against has not had legislative seats in proportion to its voting potential. *The plaintiffs' burden is to produce evidence to support findings that the political processes leading to nomination and election were not equally open to participation by the group in question— that its members had less opportunity than did other residents in the district to*

*participate in the political processes and to elect legislators of their choice.*

*White v. Regester, Id.* at 765–66, 93 S.Ct. at 2339. (Citation omitted). (Emphasis supplied).

In upholding the lower court's finding that in Dallas County the at-large system was "not equally open" to minority groups, the Supreme Court noted particularly: 1) the history of official racial discrimination in Texas that even affected the rights of blacks to register and vote; 2) the Texas rule that required a majority vote as a prerequisite to nomination in a primary; 3) the ballot "place" rule that essentially reduced at-large elections to a series of head-to-head contests; 4) the fact that only two blacks had been elected as members of the Dallas County legislative delegation since Reconstruction; 5) the fact that the Democratic Party slate was controlled by a white-dominated organization—the Dallas Committee for Responsible Government—that had no need for black support to win elections, and that demonstrated a commensurate lack of concern for black needs, and 6) the use of racial campaign tactics by white candidates to defeat black or white candidates who had overwhelming black support.

Concerning the situation in Bexar County, the Court noted: 1) the existence of Mexican-Americans as "an identifiable class for Fourteenth Amendment purposes . . ."; 2) historical mistreatment of Mexican-Americans, who made up 29% of the county's population, in the areas of employment, economics, health and politics; 3) cultural and language barriers making participation in political and community life most difficult; 4) a history of poll taxes and highly restrictive registration procedures, with resultant low Mexican-American registration; 5) as a "residual impact of this history" the fact that only five Mexican-Americans had served in the Texas Legislature since 1880, and 6) the insensitivity of the Bexar County legislative delegation to Mexican-American interests.

Reaffirming that *Whitcomb* "did not hold that every racial or political group has a constitutional right to be represented in the state legislature," the Supreme Court went on to state that the District Court

. . . did, from its own special-vantage point, conclude that the multimember district as designed and operated in Bexar County, invidiously excluded Mexican-Americans from effective participation in political life, specifically in the election of representatives to the Texas House of Representatives. On the record before us, we are not inclined to overturn these findings, representing as they do a blend of history and an intensely local appraisal of the design and impact of the Bexar County multi-member district in the light of past and present reality, political and otherwise.

*Id.* at 769–70,[8] 93 S.Ct. at 2341.

A subsequent Fifth Circuit decision, which has applied the *White* and *Whitcomb* decisions, provides substantial additional guidance on the proper circumstances where an at-large voting system may be found violative of the Constitution. In *Zimmer v. McKeithen,* 485 F.2d 1297 (5th Cir. 1973), *aff'd on other grounds, sub. nom East Carroll Parish School Board and East Carroll Parish Police Jury v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976) the full bench of the Fifth Circuit

---

**8.** Although the multi-member district portion of the lower court opinion was affirmed, the case was remanded because of the Supreme Court's reversal of a separate portion of the lower opinion dealing with the 1970 House plan.

On remand, *sub nom. Graves v. Barnes,* 378 F.Supp. 640 (W.D.Tex.1974) the lower court invalidated the at-large systems in seven other Texas legislative districts, for reasons similar or identical to those in its original opinion related to the Dallas and Bexar County districts.

This decision was remanded by the Supreme Court because of the possibility of mootness, *White v. Regester,* 422 U.S. 935, 95 S.Ct. 2670, 45 L.Ed.2d 662 (1975). On remand, it was determined that a case and controversy remained only as to one of the seven counties, Tarrant County, due to the passage of a Texas statute transforming all the former multi-member legislative districts into single-member units. *Graves v. Barnes,* 408 F.Supp. 1050 (W.D.Tex.1976).

reversed a panel approval of the at-large system for election of a Louisiana School Board and Police Jury. In finding the challenged system unconstitutional, the court articulated the *Whitcomb* and *White* standards as follows:

> Where it is apparent that a minority is afforded the opportunity to participate in the slating of candidates to represent its area, that the representatives slated and elected provide representation responsive to minority's needs, and that the use of a multi-member districting scheme is rooted in a strong state policy divorced from the maintenance of racial discrimination, *Whitcomb v. Chavis, supra,* would require a holding of no dilution. *Whitcomb* would not be controlling, however, where the state policy favoring multi-member or at-large districting schemes is rooted in racial discrimination. Conversely, where a minority can demonstrate a lack of access to the process of slating candidates, the unresponsiveness of legislators to their particularized interests, a tenuous state policy underlying the preference for multi-member or at-large districting, or that the existence of past discrimination in general precludes the effective participation in the election system, a strong case is made. Such proof is enhanced by a showing of the existence of large districts, majority vote requirements, anti-single shot voting provisions and the lack

of provision for at-large candidates running from particular geographical subdistricts.

*Id.* at 1305. (Footnotes omitted).[9]

Based on these guidelines, the Fifth Circuit examined the long history of racial discrimination in Louisiana, particularly in the field of voting. The court noted that during a forty year period, 1922–1962, not a single black had been permitted to register in the parish. The court recognized the detrimental effect of Louisiana's majority-vote rule in primaries on the opportunity for access to the political process by minority groups. Significant also to the Fifth Circuit conclusion was that the multi-member system was a recent innovation, unsupported by a strong state policy. In the court's view, these factors outweighed the circumstances that some blacks had successfully sought electoral office, or that there had been no specific showing that the representatives elected by the at-large scheme neglected minority interests.

■ The teachings of these cases cannot be compressed into any neat axioms. But their critical underlying theme is that cognizable minority groups must have a meaningful opportunity to participate in political affairs by having access to the political process. "[A]ccess to the political process . . . [is] . . . the barometer of dilution of minority voting strength."[10]

9. In affirming *Zimmer*, the Supreme Court's *per curiam* opinion specifically withheld approval of the Fifth Circuit's formulation of the constitutional principles governing appraisal of at-large election schemes.

10. Two major Supreme Court decisions set the stage for *Whitcomb* and *White* by suggesting standards to be used in suits judging at-large systems. *See Burns v. Richardson,* 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966); *Fortson v. Dorsey,* 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965). In addition to the *Zimmer* decision, cases applying *White* or *Whitcomb* and invalidating an at-large election scheme include: *Wallace v. House,* 515 F.2d 619 (5th Cir. 1975); *Turner v. McKeithen,* 490 F.2d 191 (5th Cir. 1973) (involving a police jury similar to the one at issue in *Zimmer*); *Blacks United for Lasting Leadership, Inc. v. The City of Shreveport,* 71 F.R.D. 623 (W.D.La.1976); *Stewart v. Waller,* 404 F.Supp. 206 (N.D.Miss.

1975); *Lipscomb v. Wise,* 399 F.Supp. 782 (N.D.Tex.1975); *Pitts v. Busbee,* 395 F.Supp. 35 (N.D.Ga.1975). *See also Beer v. United States,* 374 F.Supp. 363 (D.D.C.1974), *rev'd on other grounds,* 425 U.S. 130, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976). For cases refusing to invalidate election systems where similar attacks were made, *see Bradas v. Rapides Parish Police Jury,* 508 F.2d 1109 (5th Cir. 1975); *Wilson v. Vahue,* 403 F.Supp. 58 (N.D.Tex.1975); *Van-Cleave v. Town of Gibsland, Louisiana,* 380 F.Supp. 135 (W.D.La.1974); *Dove v. Bumpers,* 364 F.Supp. 407 (E.D.Ark.1973), *vacated on other grounds,* 497 F.2d 895 (8th Cir. 1974). *See also Seals v. Quarterly County Court of Madison County, Tennessee,* 496 F.2d 76 (6th Cir. 1974). Finally, in *Kendrick v. Walder,* 527 F.2d 44 (7th Cir. 1975) the Court of Appeals reversed a lower court dismissal for failure to state a claim and remanded the case for a hearing on the constitutionality of the city council election system in Cairo, Illinois. The

*Zimmer v. McKeithen, supra* at 1303. *See also Chapman v. Meier,* 420 U.S. 1, 17, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975).

In determining whether political failure is an unhappy but legitimate consequence of competition, or an intolerable manifestation of invidious racial discrimination, a district court must undertake "an intensely local appraisal of the design and impact of the . . . multi-member district in the light of past and present reality, political and otherwise." *White v. Regester, supra,* 412 U.S. at 769–770, 93 S.Ct. at 2341.

Such an appraisal has been undertaken by this court in the instant case. The Boston School Committee election system has been analyzed in the light of certain factors, listed below, that have been determined relevant and significant in prior decided cases. None of these factors is controlling. Rather, it is the cumulative impact of the analysis that compels this court's decision.

The court has assessed the facts of this case with the following questions in mind:

1. Do blacks in Boston comprise an identifiable group for purposes of this suit?

2. Do the elected candidates look for support from blacks?

3. Are those elected aware of and responsive to the needs of blacks?

4. Has there been a history of racial campaign tactics by successful candidates?

5. Are School Committee elections characterized by bloc voting along racial lines?

6. Has there been a history of invidious racial discrimination in Massachusetts, especially in the area of voting?

7. Is the challenged election system characterized by procedures that discourage or deny access of blacks to the political process?

8. Is "bullet" voting, a tactic permitting minorities to maximize the potential of their voting power, allowed under the present system?

9. Is there a ballot "place" rule in Boston's School Committee elections?

10. Is there a majority vote requirement before a candidate can move from a preliminary to the final election?

11. What is the proportion of successful black candidates, or black sponsored candidates, in relation to the community's ethnic and racial population breakdown, both in the primary and final elections?

12. Who decides who may be a candidate for the Boston School Committee? Is the opportunity to run for election open to all, or is it controlled by political parties or other private power sources?

13. Do blacks find themselves isolated, culturally or otherwise, from Boston's mainstream?

14. Is there legitimate, rational support for the state policy favoring multi-member or at-large districts?

15. Are black registration and voting rates substantially lower than the rates of the population as a whole?

## III

### FINDINGS OF FACT

#### A) *Background up to 1960*

In 1787, Prince Hall, a black veteran of the Revolutionary War, petitioned the Massachusetts Legislature on behalf of the black citizens of Boston. Hall's plea was that "our children . . . now receive no benefit from the free schools in the town of Boston which we think is a great grievance . . . ." His petition was ignored. Despite this lack of response, a school for black children was founded in 1798 at the home of Prince Hall. In 1800, a request to the City of Boston for support of the school was turned down.

In the 1820's, this school, known then as the Smith School, was taken over by the City and operated as a separate school for black children. In 1849, the parents of chil-

continuing vitality of the *White* and *Whitcomb* standards has recently been recognized in *Beer v. United States, supra,* at 143, 96 S.Ct. at 1365.

(White, J., dissenting) and at 1371, *et seq.* (Marshall, J., dissenting).

dren in the Smith School unsuccessfully petitioned for its abolition and for the inclusion of black children into the white school system. Litigation followed and in *Roberts v. City of Boston,* 59 Mass. 198 (1850), the Supreme Judicial Court found no denial of equal rights to black students stemming from the school system's policy of segregation.

More than a century ago, in 1875, the existing at-large system for electing the Boston School Committee was adopted. It has been suggested that its adoption was part of an attempt to blunt the potential political impact of the newly-arriving Irish.[11] At the time the at-large system was adopted, blacks comprised only about 1.5% of Boston's population, which in 1875 was in the neighborhood of 300,000.[12]

During the last half of the nineteenth century, several blacks were elected to the legislature. In 1896, however, Boston's predominantly black ward was redistricted, with the result that no black was elected to the legislature for "many, many years." Tr. 2404. During the same period, one black was elected to the School Committee and eleven to the City Council. Tr. 2405.[13] In 1906, the size of the Boston School Committee was set at five. At that time the population of Boston was a little over 2% black.

From the post-Civil War period to the present, blacks have been the victims of discrimination in such areas as housing, employment and education. During this same period, at least up until recent years, Irish and Italians, among other minorities, were subject to discrimination similar in nature and scope, if not intensity and impact.

11. This, at any rate, was the position taken by The Pilot, a Boston Catholic newspaper, in an article published on May 22, 1875. This indication of discriminatory intent underlying the at-large voting system might have given rise to a cause of action among Irish-American residents of Boston. This court, however, does not find it necessary to reach the question of intent in order to deny the plaintiffs' claim. *See* n. 7 *supra.*

12. See Appendix for population statistics.

B) *Background since 1960*

Boston is divided into 22 wards and 252 precincts. In 1970, Boston's population was 641,071, of which some 104,685 were black.

Today, the vast majority of blacks in Boston live in the three contiguous neighborhoods of Roxbury, Dorchester and the South End. Blacks comprise a majority of the population in four wards: Ward 8, Roxbury, east and south, (51% black); Ward 9, Roxbury, central, South End, (74% black); Ward 12, Roxbury, east, (90% black) and Ward 14, Dorchester, west, and Mattapan, (76% black). Certain precincts of Wards 4, 10 and 11 adjoining these neighborhoods and 13, Columbia Point, have a black majority population. The remaining Boston wards have a black population of less than 15%. Although Boston contains many ethnic neighborhoods, the relative concentration of Boston's black population in one area is greater than for any other sizeable ethnic group.

The median income of the black family is considerably lower than the city-wide average, although the poorest area in Boston, Charlestown, is overwhelmingly white. Boston's black population has suffered from a disproportionately high level of unemployment and under-employment. Generally the level and quality of education is lower for blacks than for the average inhabitant of this city. As for the physical condition of the area in which the bulk of the black people in Boston live, this court has said:

. . . In Boston the term "Roxbury" probably carries many of the connotations which "Harlem" does in New York City. Unfortunately, streets in disrepair, burned out houses left standing, and rubbish left on side streets in parts of Rox-

13. The findings in this paragraph are based on the testimony of plaintiffs' witness Prof. Guinier. He testified that there was material stating that one black, a Dr. Courtney, had served on the Boston School Committee prior to 1900. Despite this testimony, plaintiffs' position is that no black has ever been elected to the School Committee. Whether, in fact, no black, or merely one, has been elected is inconsequential to the court's decision.

bury cannot help but intensify the identification of parts of this section of the city.

*Morgan v. Hennigan*, 379 F.Supp. 410, 471 (D.Mass.), *aff'd sub nom. Morgan v. Kerrigan*, 509 F.2d 580 (1st Cir. 1974), *cert. denied* 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975).

Recent decisions in this Circuit have recognized continuing discrimination against blacks in a variety of areas. *Associated General Contractors of Mass. Inc. v. Altshuler*, 490 F.2d 9, 18 (1st Cir. 1973), *cert. denied* 416 U.S. 957, 94 S.Ct. 1971, 40 L.Ed.2d 307 (1974), dealt with attempts to remedy deep-rooted discrimination against blacks in the construction trades. Discriminatory practices in hiring firefighters have been struck down in *Boston Chapter, N.A. A.C.P., Inc. v. Beecher*, 504 F.2d 1017 (1st Cir. 1974), *cert. denied*, 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975). A similar suit has forbidden discrimination in the recruitment and hiring of Boston's police. *Castro v. Beecher*, 459 F.2d 725 (1st Cir. 1972).[14] In *Arrington v. Massachusetts Bay Transportation Authority*, 306 F.Supp. 1355 (D.Mass.1969) the hiring practices for transit authority drivers and collectors were found to be discriminatory. Finally, in the course of its decision in *Morgan v. Hennigan, supra,* this court found racial discrimination in the Boston School Committee's hiring of school personnel, 379 F.Supp. at 463 *et seq.,* as well as a reluctance to eliminate or reduce the effects of such discrimination. As noted above, the black community suffers residential isolation to a much greater degree than other groups in the city. This pattern is both a cause and effect of the educational segregation that has been tolerated and even promoted by the action of the School Committee. *Morgan v. Hennigan, supra,* 379 F.Supp. at 470.

### C) School Committee Elections Since 1961

Given this background, the recent involvement of the black community in School Committee politics can best be understood through an analysis of the figures and issues prominent in the School Committee elections since 1961.[15]

### 1961 Election

The fundamental issue in the 1961 campaign was the quality of education offered the school children of Boston by the School Committee. Issues relating to race were not prominent.

A significant force in the 1961 School Committee election was the Citizens for Boston's Public Schools (Citizens), a multiracial organization. Its efforts were directed towards electing School Committee members who would enhance the quality of educational opportunities for all Boston's children. In 1961, this group supported four candidates, including Melvin King, a black. The four Citizens candidates shared a campaign coffer and espoused a common platform.

Twenty candidates, including the four Citizens candidates, filed nomination petitions. A preliminary election was held on September 26, 1961. All four Citizens candidates came in among the top ten and so moved on to the final election in November.

14. *But see Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

15. The evidence in this case has concentrated on School Committee elections since 1961. The most obvious explanation for blacks' lack of success as candidates prior to 1961 was their lack of voting strength as a group in Boston. See Appendix. Of course, even if there were only one black person in Boston and he or she ran for the School Committee, that person should have the same access to the electoral process as any other candidate. The court must recognize, however, that a candidate's chances for success at the polls—as distinct from his access to the process—will be affected by the electorate's tendency to "vote for one of its own." This tendency may or may not be a dubious basis for casting a ballot, but the court is not prepared to say that it unconstitutionally deprives minorities of access to the election process.

A reason for the improved possibility for success by black candidates since 1961 has been the Civil Rights movement—which galvanized blacks as a political force and also had a salutary effect on the conscience of a significant segment of the white majority with respect to racial issues.

In the final election, two of the Citizens candidates, William E. O'Connor and Arthur Gartland, placed second and fifth respectively and thus became members of the School Committee. Melvin King ran seventh and, therefore, was not elected. He was the only black candidate in either the preliminary or the final election that year.

This was King's first attempt at public office. He was thirty-two years old and had earned a B.S. as well as an M.A. in education. King had been actively involved in running youth programs in the South End of Boston and was well known in that area. At least at the outset of that campaign, however, his contacts with other areas of the city were limited.[16]

Notwithstanding the fact that this was his first venture as a candidate, King did very well in many areas of the city that were not predominantly black,[17] and carried the black areas of the city with large majorities. But King suffered from the chronic, two-headed problem plaguing black political candidates, Boston's small black population, and relatively low registration and voting rates among black citizens.

A comparison of 1961 registration and voting rates of persons in predominantly black wards with the same figures in predominantly white wards demonstrates that, with some exceptions, the overall participation—factoring in both registration and voting—was less in the predominantly black wards than in the white wards. In the 1961 final election, 47% and 60% of the eligible voters in Wards 9 and 12, the predominantly black wards at the time, were registered, versus 69% of the voters in the city as a whole. Moreover, only 30% and 25% of Wards 9 and 12 actually voted, compared to 33% of the city as a whole. The result is that, of the eligible residents of Wards 9

and 12, only 14% and 15% voted, versus 23% of the city as a whole.

Most candidates on the Boston political scene look to their own ethnic group as a solid base upon which to build support. Plaintiffs have argued in fact that "support of their own community" is "a necessary ingredient to a black candidate's victory." Plaintiff's brief p. 31. Black candidates are inevitably disadvantaged, therefore, by relatively low black participation in the registration and voting process.[18] Of the ten named plaintiffs in this case, only two voted in School Committee elections in the years 1965–1975.

### 1963 Election

In 1962, the Education Committee of the National Association for the Advancement of Colored People (NAACP) began vigorously pressing the Boston School Committee on the issue of *de facto* segregation. The NAACP contended that the School Committee should acknowledge the existence of *de facto* segregation in the Boston school system and then take steps to end it. In addition, the School Committee was pressed to deal with issues involving racial discrimination in the assignment of permanent teachers, the hiring of black teachers and administrators, and racially-biased textbooks. The NAACP continued to meet with the School Committee in 1962 and into 1963. Progress was made in some areas, but the School Committee would not concede the existence of *de facto* segregation in the Boston public schools.

In June of 1963, black public school students supported a boycott of the Boston schools. This "stay-out" was organized by the Massachusetts Freedom Movement, a group based in the black community. The boycott received wide attention in the press.

---

**16.** King is currently serving in his second term as a state representative from the South End area.

**17.** For example, King ran first in Ward 4, third in Ward 5 and fourth in Ward 21, all "liberal" wards at that time and not predominantly black.

**18.** Of course, such a lack of participation can signal the despair which comes from being denied practical access to the political process, as was found in the *White* case with the Chicanos of Bexar County, Texas. As shall be discussed *infra,* the record in this case does not support such a finding.

In the fall of 1963, King was again a Citizens slate candidate. It was more difficult in 1963, however, for Citizens candidates to find sympathetic voters and committed campaign workers in the "high-numbered" wards—West Roxbury, Hyde Park and Dorchester—where sentiment against the boycotts and the positions of the NAACP was high. Again, the candidates on the Citizens slate shared campaign funds and espoused a common philosophy, and again two of the Citizens candidates, William O'Connor and Arthur Gartland, were successful.

Melvin King, the only black candidate, succeeded in finishing among the top ten in the preliminary election. In the final election, he finished seventh, as he had done in 1961. But, in addition to running well in the black wards, King ran first in Ward 4, second in Ward 5 and fifth in Ward 11, which were not and are not predominantly black. Again, he was hampered by the fact that the blacks registered and voted at levels substantially below the level of electoral participation of the city as a whole. For example, the percentages of eligible residents of Wards 9 and 12 who registered and voted in the final election were respectively ten percent and five percent below the city average of 42%.

### 1965 Election

In February 1964, black students staged a second boycott of the Boston public schools to protest the continuing refusal of the School Committee to address directly the problem of *de facto* segregation in the city's school system. In January of 1964, the then chairman of the School Committee opened the year with the comment that the Boston public schools were not inferior but were plagued by an "inferior" type of student, referring to the black students.

Also in 1964, Governor Peabody appointed a commission, headed by Owen Kiernan, the Chairman of the State Board of Education, to study the issue of segregation in the Boston schools. The following year, 1965, the Kiernan Commission reported that racial imbalance did exist in the Boston

schools. This report led to passage in April 1965, by the Massachusetts legislature, of the Racial Imbalance Act, which mandated the racial balancing of Boston's schools. That year Gartland, alone of the five School Committee members, urged that the recommendations of the Kiernan report be adopted so as to remedy the problem of segregation in the Boston schools. All these events received extensive coverage in the various news media.

Simultaneously, efforts were begun to increase the number of black registered voters. In 1964, the Boston Election Commission, in conjunction with the League of Women Voters and the NAACP, began a mobile registration drive. This approach involved a first-time effort to reach out into the community to find and register qualified but unregistered voters.

In the fall of 1964, Edward W. Brooke, a black, was elected to a second term as Attorney General of the Commonwealth of Massachusetts. He carried the city of Boston, defeating his opponent, James W. Hennigan, a white, by 123,122 votes to 115,627.

In 1965, King again ran as a Citizens endorsed candidate, as did Gartland and three others. O'Connor, a Citizens endorsed candidate in 1961 and 1963, ran without the Citizens endorsement. All five Citizens candidates survived the preliminary election but lost in the final, Gartland finishing sixth and King, seventh. King did well in Wards 4, 5 and 21, in addition to the predominantly black wards.

In 1965, the participation of eligible residents from predominantly black wards was virtually equal to, or only slightly below, the participation rate for the city as a whole. The rate of participation of black residents in the 1965 election was some 1.5% below that of white residents. In all succeeding elections, there has been a greater disparity between the two rates.

From 1961 to 1965, tension increased over the issues relating to segregation in the Boston public schools. The Racial Imbalance Act and the possibility of busing or redistricting as methods to integrate the

school system became increasingly prominent issues. Candidates, like Gartland and King, who favored the recognition and solution of the problem of segregation in the Boston schools, found substantial portions of Boston's electorate veering away from them.

King found it more difficult to attract white campaign workers and to organize in white areas. This was particularly so in those sections most adamant in their opposition to the Racial Imbalance Act, such as the Dorchester-Neponset area, Wards 15, 16 and 17, and South Boston, Wards 6 and 7.

At candidates' nights and other public appearances, all the candidates found the voters concerned with the issue of segregation and the potential methods for eliminating it. At times, it became very difficult for any candidate, white or black, to discuss in any depth general issues of quality education.

### 1967 and 1969 Elections

No black candidate ran for the School Committee in 1967. The rates of participation for predominantly black Wards 9 and 12 were 15% and 1% below the city-wide average of 46%. The Citizens Committee did not run a slate after 1965.[19] The tide of emotion on the issue of race abated somewhat as the State Board of Education began the task of attempting to enforce the Racial Imbalance Law. Efforts were constantly made to repeal the law, spearheaded by, among others, School Committee member Louise Day Hicks.

In 1967, however, a black man, Thomas Atkins, former executive secretary of the local NAACP and closely connected with the de facto segregation controversy, ran for the Boston City Council. In Boston, the City Council elections are an exact parallel to the School Committee at-large election procedure. The only difference is that the preliminary election for the City Council reduces the field to eighteen, from which nine are selected in the final election.

Out of forty-four candidates running in the 1967 preliminary election for City Council, Atkins ran fifteenth. In the final election he ran seventh out of eighteen and thus became a member of the Boston City Council, the first black member in recent history.

In 1968, the Election Commission program for registering voters was drastically expanded and a specific effort was made to register black voters. The Commission initiated the practice of maintaining registration offices year round, five days a week, both at City Hall and at sixteen "little city halls" in various areas of the city. In addition, registration centers were maintained at sites selected in collaboration with the NAACP and other agencies and groups in the black community, and at major Transit Authority stations in black residential areas.

By statute, Mass.Gen.Laws ch. 51 § 42B, the Election Commission is required to set up a registration station any time that ten registered voters report that there are ten unregistered voters at their principal place of activity. These registration efforts were spearheaded by Alfred Brothers, a black, who in 1968 was one of the four city election commissioners. Since 1968, the greatest part of commission resources has been dedicated to registration of voters in areas of minority population. In planning its efforts to increase voter registration, the Election Commission concentrates on those areas where registration is the lowest. Its philosophy is to locate and register potential voters, particularly minority voters.

In the 1969 preliminary election for School Committee, one black candidate ran but did not survive the preliminary election. There was, therefore, no black candidate in the final election for School Committee. Twenty-eight percent of the city's eligible residents voted, versus 18% in Ward 9 and 26% in Ward 12. In addition, in Wards 8 and 14, which by this time were substantial-

19. In 1966, Attorney General Brooke was elected a United States Senator from Massachusetts. He did not carry, however, the City of Boston against his opponent, former Governor Endicott Peabody.

ly black, 22% and 17% of the eligible residents voted.

In 1969, however, Atkins ran successfully for a second term on the Boston City Council. His victory was impressive, and his tactics in achieving it were described in detail by Paul Parks, a black man who was then one of Atkin's campaign managers for the election, and who is now Secretary of Education of the Commonwealth of Massachusetts.

Tom Atkins set up, fed into the computer the data from all other black, any other black candidates who had run for office. He fed those into the computer, where they got their votes from; then he took candidates who had been considered liberal, and he fed those into the computer. So he knew exactly every area of the city where he could get any kind of vote out of at all. And then, once he identified by precinct and street, in many cases, where these people came from, then he went out and after that vote. And he didn't campaign anywhere else but exactly where he saw that vote being able to be gotten.

So he didn't expend his energy or waste time trying to run in areas that he didn't see that strength coming from. And he pulled an awfully high number of his own strength out.

Tr. at 282–83.

Atkins' approach in one particular area of the city was enlightening, as described by Mr. Parks.

I remember in West Roxbury there was a question about some trucks going to the dump, and there had been some problems about that. And Tom took a position in favor of the citizens, and went out and actively took a position. . . .

. . . And he actually went out and took part in that issue, which was a very hot issue in West Roxbury at that time.

And he got a fairly decent vote out of West Roxbury for this effort.

In putting together his campaign, Atkins, who at the time was a student at Harvard Law School, took advantage of resources at Harvard University, in the form of fellow students as campaign workers, advice from professors and access to computers. The result of these efforts was that, in the final election, Atkins ran second in the race for City Council, ahead of sixteen white candidates. His vote was exceeded only by that of Louise Day Hicks.[20]

### 1971 Election

During 1971, the desegregation controversy began to boil once more as the State Board of Education threatened to impose sanctions on Boston for failure to comply with the Racial Imbalance Act. Controversy arose over the Lee School, a newly constructed elementary school, which the School Committee had promised would be opened racially balanced. In order to accomplish this, the School Committee had planned the transfer of some 350 white students from the overcrowded Fifield and O'Hearn Schools. The School Committee at first gave the students the option of remaining at their old schools or transferring to Lee. When it was pointed out that this option would effectively eliminate the possibility of Lee opening as an integrated

20. Plaintiffs argue that the exceptional resources available to Atkins, the timing of his election campaign and the fact that he was running for the City Council and not the School Committee make his victory in 1969 irrelevant to the present case. Atkins has given his opinion that he could not win as a candidate for School Committee today. The court, however, finds the results of this election, run under almost identical procedures and during the time period in question, extremely relevant to the issues of this case, particularly blacks' *access* to and the rate of their participation in the political process.

The basic tactic of Atkins in scoring his victory—locate your pockets of support and get it to the polls—is the approach taken by the many successful candidates for office who were witnesses in this case. *See* testimony of City Councilor DiCara, Tr. 2279, and School Committee member Finnegan, Tr. 3137–38.

Atkins' highly organized campaign then, far from being a unique phenomenon, actually fits into the pattern of other successful city-wide races in Boston at approximately the same time.

school, the option was eliminated by a 3–2 vote of the School Committee.

In the preliminary election for School Committee, defendant Kerrigan, who had opposed withdrawal of the option, received more votes toward his re-election than any other candidate. Thereafter, at a meeting of the School Committee on September 21, School Committeeman John Craven changed his vote, creating a 3–2 majority in favor of permitting the white students to remain at their old schools. The Lee School eventually opened as a racially imbalanced, predominantly black school. The transfer of the white students to Lee School would have relieved overcrowding at both the Fifield and O'Hearn Schools and would not have required any busing. *See Morgan v. Hennigan, supra,* 379 F.Supp. at 431.

The minutes of the September 21 School Committee meeting depict a gathering very much in the nature of a political rally. Various political candidates, including defendant, then Congresswoman, Louise Day Hicks, rose to state their support for the new majority position of the School Committee. Many speakers voiced their opposition to redistricting and the racial balancing of Boston's schools.

It was in this atmosphere that Patricia Bonner-Lyons, a black woman, made her first attempt at public office. She received broad-based black support. Many white groups and organizations also endorsed Bonner-Lyons, including *The Boston Globe,* the Democratic Committees of Wards 4 and 5, the racially-mixed Amalgamated Meatcutters and Butchers Workers Union and the Americans for Democratic Action. Forty percent of Bonner-Lyons' campaign workers were white. She maintained two campaign offices, one in a white area and one in a black area of the city.

Bonner-Lyons, at the time of her first race for School Committee, was twenty-three years old and had only worked in one prior campaign. She had moved to Boston in 1964, but from 1964 to 1968 had attended college in Missouri. In 1971, she was working at the New England Baptist Hospital as a medical technician. She was chairwoman of the Young Workers Liberation League, a Socialist organization. Some attempted to put a "Communist" tag on her candidacy, but Bonner-Lyons felt that the publicity she received as result of her affiliations actually benefited her politically.

The thrust of Bonner-Lyons' campaign was to emphasize the low quality of the Boston public school system. She emphasized, as well, her support of the Racial Imbalance Act. Bonner-Lyons' views on this subject aroused vehement opposition in certain areas of the city, including South Boston, parts of Hyde Park, West Roxbury, Jamaica Plain, East Boston and Charlestown. Occasionally, she was the subject of verbal harassment.

Bonner-Lyons involved herself extensively with the registration of new voters. Her campaign workers distributed literature urging registration. The Model Neighborhood Board and other groups and agencies within the city made massive efforts to register voters. Beyond this, black churchmen and the NAACP attempted to maximize black voting impact by urging that black voters "bullet vote"—that is, vote for Bonner-Lyons only.[21]

In the September preliminary election for School Committee, Bonner-Lyons finished ninth in a field of fourteen, defeating five white candidates. In the final election, she came in eighth and failed to become a member of the School Committee.

As in other years, the percentage of registration and turn-out in the predominantly black areas of the city, both in the preliminary and final elections, tended to be below the registration and voting percentages for

---

**21.** In the final election for School Committee Boston's voters may cast ballots for five candidates. By casting a ballot for one candidate only, the voter not only supports his or her favorite but deprives four other candidates of a vote. In an at-large election this is the most powerful way to express support for an individual candidate. One witness described a single bullet vote in these circumstances as five times as strong as a ballot which is cast as one of five ballots. This is also known as a "single-shot" vote.

the city as a whole. Forty-three percent of the eligible residents of Boston voted, whereas 33% of Ward 8, 34% of Ward 9, 41% of ward 12, and 32% of the eligible residents of Ward 14 voted.

In the fall of 1972, about one year after the Bonner-Lyons' loss, U.S. Senator Edward Brooke won re-election to his second term, carrying the City of Boston against his white opponent, John Droney, the Middlesex County District Attorney, 93,218 votes to 81,061.

### 1973 Election

In March of 1973, the School Committee adopted a resolution authorizing the distribution through the schools of notices publicizing an anti-busing rally to be held on April 3. In response to a law suit filed by pro-Racial Imbalance Law parents, the School Committee amended its authorization of additional rally notices by including the statement that they were prepared by the Home and School Association and not by the Committee. See Bonner-Lyons v. School Committee of City of Boston, 480 F.2d 442, 443 n. 2 (1st Cir. 1973).[22]

The Annual Report of the Home and School Association for 1972–73 states:

> Busing was and is the leading issue with parents and teachers throughout the City of Boston . . .. The first "Protest March" was held on April 3, 1973 and other marches followed.

Bonner-Lyons was again a candidate for School Committee, the only black to run. She was the victim of physical threats and, sometimes, assaults. At a campaign event in South Boston High School, the tires of her car were punctured. The words "Nigger Lover" were written on a campaign worker's house. She lost workers who decided that it was too dangerous to support her. Because of the shoving or jostling she received, Bonner-Lyons hired two bodyguards—one to stay with her and one with her car. Eventually she decided not to campaign in those areas of the city where she felt animosity towards her was the strongest.

Despite this adversity, Bonner-Lyons ran tenth out of a field of twenty-two in the preliminary election. In the final election she finished ninth.

The voter turn-out in this "off-year" election[23] was extremely low city-wide. Only about 18% of Boston's eligible residents voted. Even among eligible residents who were registered, only 30% voted. Thirteen percent of the eligible residents of Ward 8 voted, 13% of Ward 9, 17% of Ward 12 and 11% of Ward 14.

### 1975 Election

During the two years preceding the 1975 election, the public's attention was even more intensely focused on racial issues affecting Boston's public schools.[23A]

Probably the most significant relevant event in these two years was the finding by this court that Boston's public schools had been unconstitutionally segregated by the purposeful actions of the School Committee and the superintendent of schools. Morgan v. Hennigan, 379 F.Supp. 410 (D.Mass.) aff'd sub nom. Morgan v. Kerrigan, 509 F.2d 580 (1st Cir. 1974), cert denied, 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975).

The finding was based on a history of school committee actions and inactions spanning a decade, involving overcrowd-

---

**22.** The Court of Appeals eventually directed this court to enjoin the distribution of such notices when no opportunity was given groups with opposing views to use the schools as a means for publicizing their positions.

**23.** The Boston mayoralty campaign which occurs every four years is considered the "on-year" election. Voter turn-out for all campaigns is typically higher in "on-year" elections.

**23A.** One widely publicized incident that occurred in 1974, and resulted in a 1975 federal prosecution, involved a black who was dragged from his car and beaten, while driving through South Boston during the course of an anti-busing demonstration. U. S. v. Griffin, 525 F.2d 710 (1st Cir. 1975), cert. denied, 424 U.S. 945, 96 S.Ct. 1414, 47 L.Ed.2d 351 (1976).

ing and underutilization of facilities, placement of portable classrooms, use of new facilities, districting, feeder patterns, open enrollment policies, and hiring and assignment of faculty and staff, which intentionally brought about and maintained a dual school system in Boston. *Morgan v. Kerrigan,* 401 F. Supp. 216, at 224 (D.Mass. 1975), *aff'd* 530 F.2d 401 (1st Cir. 1976) *cert. denied,* 426 U.S. 935, 96 S.Ct. 2649, 2648, 49 L.Ed.2d 386 (1976). In addition, orders from the Massachusetts Supreme Judicial Court required the School Committee to apply the plan submitted to them by the state in order to assure such compliance in the 1974–75 school year.[24]

This court's decision ordered the School Committee and the superintendent to "begin forthwith the formulation and implementation of plans which shall eliminate every form of racial segregation in the public schools of Boston, including all consequences and vestiges of segregation previously practiced by the defendants." 379 F.Supp. at 484.

The description of the fall of 1974 by this court portrays the atmosphere in the city.

The opening of school under the state plan in September of 1974 was accompanied by some violence and much fear. School buses were stoned, their windows broken and some children cut by shattered glass. Angry crowds of white parents and students gathered in front of schools to protest the entry of black students assigned there. Student boycotts of varying effectiveness were organized. Many students stayed home or were kept home by their parents out of fear for their personal safety. Several city high schools were the scenes of racially-connected fights and incidents. As the school year continued, violence subsided, then recurred. . . . Even today [June 5, 1975] 166 state and local police officers are stationed in the halls of South Boston High School and another 134 are stationed in the vicinity during school hours. In December a white student was stabbed inside South Boston

High School by a black student. Community residents gathered and surrounded the high school building, trapping black students inside until a decoy operation by police permitted the departure of the black students. . . .

As these events were occurring, planning was renewed for the development of a citywide desegregation plan to be implemented in September 1975. After several hearings on proposals of the parties as to its terms, the court entered an order on October 31, 1974 establishing the filing date and general contents of a student desegregation plan to be filed by the defendants. . . .

Progress reports were duly filed by the defendants, but on the deadline for filing its plan, December 16, the school committee by a three to two vote refused to approve for filing with the court the plan developed by the school department at the school committee's direction and about which the progress reports had been made.

*Morgan v. Kerrigan, supra,* 401 F. Supp. at 225–26 (D.Mass. 1975).

The atmosphere was inflamed by the statements of certain politicians. For example, defendant Hicks, during a period of extreme racial tension in the fall of 1974, issued a written statement with two other white politicians, reading in part:

Why is there resistance in South Boston. Simply stated, it is because it is against our children's interest to send them to school in crime infested Roxbury . . . There are at least one hundred black people walking around who have killed white people during the past two years. They have gone unapprehended.

Defendant Hicks admitted at trial that she signed this statement. She stated she did not believe the statement to be racially inflammatory.

At a hearing on a motion by plaintiffs in the *Morgan* case to hold the three commit-

24. *See* note 6.

tee members in civil and criminal contempt for voting to refuse to file a proposed plan as ordered by this court, School Committeeman Kerrigan, now a City Councilor and a defendant in this case, stated as a reason for his vote:

> I certainly am against the forced busing of school children. I have always been against the forced busing of school children. I ran for office stating that I would never vote for a plan that involved the busing of school children. It is unfortunate that is the way our society exists, the way the housing patterns are laid out, but the only way you are going to desegregate city schools is through forced busing.

Quoted in *Morgan v. Kerrigan, supra*, 401 F. Supp. at 226.

Just prior to this court's decision in the *Morgan* case there was a special plebiscite on the question:

> Shall any Boston public school children be assigned to a particular Boston public school on the basis of race, sex or creed without the consent of their parents or legal guardians?

The response to this question was an overwhelming "No." Voter turn-out for this plebiscite, which was held on May 21, 1974, was extremely low—only 7.4% of Boston's eligible residents voting. Voter response in those wards that were predominantly black was divided on this question.[25]

On June 4, 1974, a special election was held to consider various plans for changing the composition and mode of election of the School Committee. The voters were offered four plans from which to choose. The alternative receiving the greatest support was to be included in a subsequent referendum.

Plan I would have continued the present at-large system, but increased the number of elected School Committee members to eight, with the Mayor as the ninth member, *ex officio*. Plan II suggested dividing the city into eleven "zones" with two School Committee members to be elected from each zone. Plan III stated:

> The school committee to be abolished; the schools to be under the charge of a superintendent appointed by the mayor with the approval of a city-wide advisory committee; decentralized administration; a neighborhood school council in each school district composed of parents, teachers and residents, and a high school council in each high school composed of parents, teachers and students.

Plan IV would have elected five members at-large and six from districts. In the Special Election, Plan III was the most popular, with 10,259 votes. Plan II received 8,088 votes, Plan IV 4,035 votes and Plan I, 1,461 votes.

To the despair of its supporters, Plan III (which became Question 7 on the city-wide referendum held that fall) was condemned by anti-busing forces as a concession to pro-integration and pro-busing groups. Others objected to the proposal because they saw it as "The Mayor's Plan", an attempted by him to increase his power.

There was extensive opposition to Question 7 in the form of signs, bumperstickers, leaflets and protest rallies organized by anti-busing groups. In the November 1974 election, the proposal was defeated 77,103 votes to 48,182.[26] Opponents of Question 7 included the organization Restore Our Alienated Rights (ROAR), The South Boston Information Center, The East Boston Information Center, The Mass Citizens

---

25. Only a relative handful of residents in predominantly black wards voted in this plebiscite. Of the 2.4% of eligible residents in Ward 8 who voted, 28.3% voted "yes" and 71.7% voted "no." Of the 1.6% voting in Ward 9, 56.9% voted "yes" and 43.1% "no." Of the 2.3% voting in Ward 12, 63.4% voted "yes" and 36.6% "no." Of the 1.3% voting in Ward 14, 48% voted "yes" and 52% voted "no."

26. The vote in the black areas of the city was overwhelmingly in favor of the proposed change in the election system. Many white wards also gave majority votes in favor of the change. Even in wards which voted against the change there were substantial numbers of voters favoring the proposed plan. See Defendants' Exhibit D–114.

Against Forced Busing and several leading white political figures.[27]

Plaintiffs assert that the campaign concerning, and the vote in response to, the Question 7 referendum taints the existing at-large procedure for electing the School Committee with racially discriminatory intent.[28] Much of the opposition to Question 7 certainly was directed by forces resisting attempts to integrate Boston's schools by means of busing. But the fact that anti-busing forces urged rejection of the proposed change to the existing at-large system does not establish that system as being an invidiously discriminatory scheme. *First,* many of the persons who actively opposed Question 7 had supported one of the other alternatives for changing the method of electing the School Committee offered in the June special election. One figure prominent in the East Boston Information Center, which opposed Question 7, had been active in the Committee to Elect Plan II. Another School Committee member, and a defendant in this suit, was the sponsor of Plan I. *Second,* many persons opposed Question 7 because they viewed it as a power grab by the Mayor. *Finally,* the evidence is not persuasive that the opponents of Question 7 explicitly perceived that proposal as an attempt to open the School Committee door to black voters, or that their opposition was an effort to keep that door closed.

During 1974 various groups and elected officials met constantly in efforts to circumvent, mitigate, subvert or directly resist the efforts of the State Board of Education and the federal court to desegregate Boston's public schools. In April of 1974, a march to the State House, sponsored by the "Save Boston Day Committee", urged the repeal of the Racial Imbalance Law. During the year, the City Council chambers were used as the weekly meeting place of anti-busing and anti-integration forces.

Large letters spelling out the acronym ROAR appeared in the windows of City Council members Hicks and O'Neil and loomed over Government Center Plaza in the heart of the city.

In November of 1974, five black state representatives and one black state senator were elected from the city of Boston.

The uproar over busing and the desegregation of Boston's schools continued into 1975, and the campaign season that year concentrated with more intensity than ever on these issues. During 1974–75, Boston's School system had begun desegregating, pursuant to a plan formulated by the State Board of Education, and reinforced by orders of this court. This period is known as Phase I. In June of 1975, this court issued a citywide desegregation plan that became known as Phase II. *See Morgan v. Kerrigan,* 401 F.Supp. 216 (D.Mass.1975), aff'd 530 F.2d 401 (1st Cir.), *cert. denied,* 426 U.S. 935, 96 S.Ct. 2648, 2649, 49 L.Ed.2d 386 (1976). In its Phase II decision this court noted,

> This is an election year in Boston and candidates are already campaigning for municipal offices. Many of them are proclaiming that they are for school desegregation but against forced busing.

*Morgan v. Kerrigan, supra,* 401 F.Supp. at 239. Throughout 1975, the School Committee continued to resist busing. In affirming this court's extensive plan for Phase II implementation of desegregation in Boston, the Court of Appeals noted:

> The overriding fact of the matter is that the district court in this case has had to deal with an intransigent and obstructionist School Committee majority. These elected officials engaged in a pattern of resistance, defiance and delay.

*Morgan v. Kerrigan, supra,* 530 F.2d at 427.

On May 23, defendant Hicks stated that Judge Garrity "has shown himself to be

---

**27.** An illustration of the anti-busing groups opposition to Question 7 was a campaign button that read: "Stop Busing Vote NO 7."

**28.** Plaintiffs, apparently, do not contend that the requirement of a referendum to ratify a change in the City Charter is *per se* unconstitu-

tional. *See City of Eastlake v. Forest City Enterprises, Inc.* —— U.S. ——, 96 S.Ct. 2358, 49 L.Ed.2d 132 (1976).

nothing more than a tool of black power advocates who will stop at nothing to gain control of this city . . . ." The judge was described as "Wellesley white" and "a man who is Irish but doesn't want to be" carrying out the orders of "a man who is black but would rather be white . . ." The latter reference was to Thomas Atkins, then local executive director of the NAACP.[29]

The opening of schools in the fall of 1975 was accompanied by an extremely high level of tension. Conditions at South Boston High School became so grave that a receiver was eventually appointed and the school's headmaster, full-time academic administrators and football coach were transferred.[30]

The issue of busing was emphasized heavily in 1975 campaign literature. Every white candidate made clear his or her opposition to "forced" busing as a means for desegregating Boston's schools. During the campaign, the School Committee went on record as favoring a Constitutional amendment banning forced busing.

The fall of 1975 was John D. O'Bryant's first attempt at election to the Boston School Committee.[31] O'Bryant, a black, is a life-long resident of Boston who earned a Master's degree in education from Northeastern University. He had worked for fifteen years in the Boston public schools as a teacher and guidance counselor. He is a former president of the Black Educators Alliance of Massachusetts.

O'Bryant served as King's campaign manager during his 1961 and 1963 runs for the School Committee, and was closely associated with his campaign in 1965. He was an unsuccessful candidate for state representative from Ward 14, Mattapan, in 1964, 1966 and 1968 and in one interim election.[32]

O'Bryant's campaign utilized a staff of 350 volunteers, 30% of whom were white, in addition to a seven person advisory committee of whom two were white, including a white former candidate for School Committee. O'Bryant earned a position on the preliminary ballot by assembling some 4,700 signatures, more than twice the mandatory 2,000.

O'Bryant campaigned in all sections of the city, with the exception of Charlestown and South Boston. He avoided these areas because he feared for his personal safety.

A column in an anti-busing newspaper, distributed in South Boston prior to the election, alerted its readers to Mr. O'Bryant's race in explicit terms:

> Well, wake up Southie. Do you realize you gave 834 votes . . . to John O'Bryant, who is a probuser . . . . I was in the Army with O'Bryant, and believe me, he's not IRISH. He is a Black Man from Roxbury, and believes in Forced Integration and Forced Busing . . . .

The same column at various times included critical references to many white candidates whose positions against forced busing were considered weak.[33]

29. When asked at trial why she said Atkins would rather be white, Hicks responded, "He is married to a white woman."

30. For a summary description of the violence and strife that accompanied the first months of the academic year at South Boston High School see *Morgan v. McDonough*, 540 F.2d 527.

31. Two other blacks, Warren Brown and Ollie Bivens, also collected the required 2,000 signatures and were among the sixteen candidates in the preliminary election. They placed twelfth and sixteenth respectively in this election, however, and thus did not move to the final election.

32. Ward 14 during this period was predominantly Jewish. The overwhelming majority of people in the ward now is black and it is currently represented in the Massachusetts House by Representatives Fortes and Bolling, who are black.

33. One of the candidates whose commitment against forced busing was questioned was Katherine Sullivan, whose campaigns have tended to emphasize issues other than busing and who had topped the ticket in the September preliminary election.

O'Bryant received the endorsement of numerous black groups and also white organizations including the Ward 4 and 5 Democratic committees and *The Boston Globe*. He came in seventh in the final election, defeating three white candidates, but did not obtain a seat on the Committee.

O'Bryant was the overwhelming choice of the black wards, but the total vote that these areas gave him was not sufficient to overcome his poor showing in some white areas. Thirty-five percent of Boston's eligible residents voted city-wide versus 25% of Ward 8, 31% of Ward 9, 37% of Ward 12 and 25% of Ward 14. O'Bryant did not involve himself with the registration of black voters, believing it would have been an unnecessary duplication of effort. O'Bryant did well in some racially mixed or predominantly white wards, including Wards 4, 5, 10, 11 and 21.

## IV

## BUSING AS A SCHOOL COMMITTEE ELECTION ISSUE

The issue of busing as an instrument of school desegregation has had a significant impact on School Committee elections, particularly since *Morgan's* mandate in 1974 of a city-wide busing program. Of significance is the historical and philosophical framework of the *Morgan* mandate.

The court has heard members of the school committee in testimony and others speak against "forced busing" and has received hundreds of letters protesting its use in connection with the state court plan currently in operation. *Toward lessening widespread misunderstanding on the point, it may be stated that the court does not favor forced busing. Nor, for that matter, have the plaintiffs advocated forced busing.* What the plaintiffs seek, and what the law of the land as interpreted by the Supreme Court of the United States commands, is that plaintiffs' right to attend desegregated schools be realized. That right cannot lawfully be limited to walk-in schools. . . . *If there were a way to accomplish desegregation in Boston without transporting students to schools beyond walking distance, the court and all parties would much prefer that alternative.* In past years, feasible proposals that would have substantially lessened segregation through redistricting without busing were made by various public agencies and uniformly rejected or evaded by the Boston School Committee. *The harvest of these years of obstruction and of maintenance of segregated schools is that today, given the locations and capacities of its school buildings and the racial concentrations of its population, Boston is simply not a city that can provide its black school children with a desegregated education absent considerable mandatory transportation.* No party familiar with the requirements of the law and with the city has ever suggested otherwise.

*Morgan v. Kerrigan, supra,* 401 F.Supp. at 239. (Emphasis supplied).

The Supreme Court has made it clear that court ordered busing is a constitutional means for achieving equal educational opportunity within a community. Judge Garrity's orders relating to the desegregation of Boston's schools have been uniformly upheld on appeal. It is beyond dispute that they are lawful orders that must be obeyed at risk of incurring sanctions of the court.

Of course the fact that these orders are the law of the land does not mean it is in any way unlawful to voice disagreement with them, so long as such disagreement is demonstrated within the framework of First Amendment rights of free speech and expression. Any question as to the legality of busing as a desegregation tool is now foreclosed. But the necessity of forced busing, its desirability, and method of implementation are legitimate subjects of debate and discussion, as are all court orders and legislative enactments.

There are undoubtedly racists among those who oppose busing. But looking with disfavor on the prospect or reality of court-ordered busing is not necessarily an expression of racial prejudice. On the evidence

presented this court cannot accept plaintiffs' contention that objection to busing is merely a "subterfuge for opposition to integration." (Plaintiffs' brief at 27.) Indeed, the evidence warrants a number of alternate explanations for opposition to court ordered busing that rest on factors other than racial prejudice.

Although a constitutionally permissible remedy for the chronic disease of segregation, busing is strong and unpleasant medicine, particularly for the children, black and white, who in a real sense are the ones on the receiving end. Because children are so dramatically affected, it is not surprising that many parents are angered and concerned over what they perceive to be an invasion of their prerogatives. Some, while not opposing desegregation, may simply disagree as to the necessity of busing, perhaps not understanding the court's conclusion that years of School Committee recalcitrance left no effective alternative available. Others may be willing to accept busing as a necessary tool to provide equal educational opportunity, but they just do not want *their* children bused to bring it about. Still others, though accepting that School Committee inaction left no alternative to court-ordered busing, may feel that they and their children have been victimized by circumstances beyond their control. There may be those who have strong ties to their own neighborhoods, for ethnic or other legitimate reasons, and so object to any program, regardless of overall social value, that removes their children from that environment for such a significant part of the day.

In their consternation, many parents may not be considering the issue of black proximity one way or the other. They simply want *their* children to stay where they are; and they resent and oppose any person, public official or institution that supports this program that has caused them so much grief. While such views may be parochial and shortsighted, they are constitutionally permissible. Any contention that such objection to busing is merely a subterfuge for opposition to integration is unsupported by the evidence and relies, rather, on the casting of some of the white population into unflattering stereotypes.

Busing, being a legitimate subject of debate, must also be recognized as a legitimate political issue, even though the validity or the vitality of the federal court order will not be affected by election results. Existing political polarization of the races is due primarily to differences in attitude over a legitimate political issue, busing.

Moreover, the relationship of the issue of busing to election results is as problematic as its relation to racial attitudes. While black parents want equal educational opportunity for their children, it is not clear that they universally favor busing as the instrument for bringing it about. And while it may be presumed that, given a choice, blacks would prefer to support "one of their own," a longstanding color-blind Massachusetts political tradition, it is not clear that such support depends on the degree to which a black candidate supports forced busing.

While the busing issue may have been an obsession of some voters, and racial prejudice a motivating factor for some others, the court finds that busing *per se* has not been the only important issue in recent School Committee elections. Even in 1975 —when, because of the controversy surrounding the implementation of the court order, tension on the subject of busing was highest—other school issues, particularly the *quality* of educational opportunity, played a significant and central part in the campaign.[34]

---

34. For example, Katherine Sullivan topped the ticket in that election. She had a reputation for being a moderate on the issue of busing in that, though opposed to court-ordered busing, she tended to emphasize other issues in her campaign. *She was not one of the three Committee members held in contempt by Judge* Garrity in December 1974 for failing to submit a desegregation plan. In the 1975 election, O'Bryant's campaign literature stated "Right now, Katherine Sullivan is the only voice for parents who want education put ahead of politics. If John O'Bryant wins, that voice will be twice as strong." (Pl.'s exhibit 38).

But, this court is not so naive as to think that black candidates for the School Committee have not been hurt by the issue of busing. A large segment of the Boston population is resentful of court-ordered busing. In varying degrees, black School Committee candidates have supported busing, with the result that vast numbers of voters perceived them to have been on the "wrong" side of an important political issue.

The court is not equipped with a crystal ball to predict the future. But, if history is any guide, as the seasons change so will the controlling political issues. It is now clear, if it has not been in the past, that court-ordered busing in Boston is constitutional, and will continue until its purpose is achieved. It will soon become apparent to the public, if it is not already, that the School Committee has no power to resist the federal court busing order, regardless of political rhetoric to the contrary. As the public becomes mindful that this is so, strident and uncompromising opposition to the orders of this court will undoubtedly shrink in importance as a qualification for election.

## V

## BLACK VOTER PARTICIPATION IN SCHOOL COMMITTEE ELECTIONS

Plaintiffs have attempted to overcome the damaging inferences which the defendants have drawn from the relatively low registration and voting rates of blacks within the city. They have offered computerized calculations to predict how the School Committee elections since 1961 *would* have come out had qualified persons in predominantly black areas registered and voted at the same rates as persons in white areas of the city. The plaintiffs' conclusion from these extrapolations is that—even had the registration and voting been at equal

rates—no black would have been elected to the School Committee.

The issue, in this case, as the court has noted *supra,* is whether black people have been denied entrance into the political arena in Boston's School Committee elections. Defendants argue that the reason for blacks' lack of success is not that the door has been closed, but that blacks have refused to walk through it in large enough numbers—presumably out of apathy. The implied corollary of this theory is that, if blacks participated more vigorously, they would be more successful politically.

Plaintiffs correctly point out that failure of blacks to participate can be a symptom of despair and frustration.[35] No one is interested in playing for long if the deck is obviously stacked. But, a closed system is merely one possible explanation for a relatively low rate of black participation in the political process. Other plausible explanations are apathy, and inadequate, but improving, political organization and leadership.

This court finds that the failure of blacks to participate at rates equal to whites is not justified on a theory of despair and frustration because of a closed political system. No political party or racist organization controls access to the ballot.[36] The opportunity to get one's name placed on the ballot in Boston has been wide open for the past hundred years to anyone, black or white, who could and would gather 2000 signatures in support of his candidacy. No majority vote requirement exists in either the primary or secondary election. Black voter registration is not discouraged. Indeed, the uncontroverted evidence is that it has been encouraged. Bullet voting is a legitimate political tactic available to blacks as well as whites. Black candidates, with some con-

---

**35.** *See, e. g., White v. Regester, supra,* 412 U.S. at 768–69, 93 S.Ct. 2332.

**36.** Plaintiffs have attempted to argue that the support given to white candidates by school department employees, through testimonial dinners, for example, has placed a special burden on black candidates who are not so supported. No evidence has been offered, how-

ever, which suggests that this group has a strangle hold on slating of candidates or that support by it is a prerequisite for success at the polls. Black candidates may have other sources of funds uniquely available to them. O'Bryant testified, for example, that about half of his campaign funds in 1975 came from outside the city.

sistency, have been successful in primary elections and have made strong finishes in the finals, despite relatively low black voter turnout. These are among the factors that distinguished the situation in Boston from that in *White* where low minority participation in Texas was found to be a symptom of a closed system.

The reverse side of the coin, the extent of white participation, may be, at least arguably, a consequence of the historical awareness of Irish, Italians and other minority groups, particularly in pre-civil service days, that political participation was a viable means to ensure economic survival; i. e., to get a job.

But even if it is assumed that the plaintiffs' simulations are technically sound and accurate, the fact that if the registration and voting rates had been the same no black would have been elected, does not mean that blacks have been denied an opportunity to participate in this aspect of Boston's political life.

*First,* in order for blacks to participate or be properly represented, it is not necessary that a *black* School Committee member be elected. Plaintiffs concede that the law only requires that some person—of whatever color—sympathetic and responsive to the needs and aspirations of the minority community be elected. No simulation has reviewed that possibility.

*Second,* these simulations have explored only the results were persons in black areas to vote at rates equal to persons in white areas. There are no predictions as to the outcome were the vote in several liberal white areas, that have registered and voted at very low levels, increased to the city-wide levels.

*Third,* plaintiffs' reliance on the simulations fails to take into consideration that the percentage of voter registration and participation of both blacks and whites is nothing to be proud of. The percentage of white participation is no magic number for minorities to emulate. The opportunity to participate in a greater percentage than

whites is available to minorities and those sympathetic to their cause. The Constitution protects that opportunity, but cannot be used as a substitute for maximum effort.

In short, the simulations raise more questions than they answer. The court is not persuaded by their proffered logic, and so does not rely on them in reaching its conclusions concerning the validity of Boston's system for electing its School Committee.

## VI

## CONCLUSIONS

Clearly Boston's at-large School Committee elections do exhibit some of the characteristics that the Supreme Court, and other courts, have recognized as symptomatic of systems which violate the rights of minorities.

■ Boston's black population is "an identifiable class for Fourteenth Amendment purposes." *White v. Regester, supra,* 412 U.S. at 767, 93 S.Ct. at 2340. Blacks in Boston have suffered from invidious treatment in many areas, and still do suffer from this discrimination to an unacceptable degree.

Defendants have emphasized that much of the suffering of Boston's black population is similar in kind, if not degree, to that experienced by non-blacks of lower economic status, both historically and in present day Boston. Such emphasis seems to suggest a theory by defendants that the discrimination suffered, for example, by Irish and Italian immigrants is a kind of social initiation rite which blacks also must endure and overcome before they can be accepted by the mainstream of society. The short answer to such a suggestion is that our Constitution and laws ensure equal protection and opportunity for all citizens, *now* and not merely at some unspecified time in the future. The emergence of Irish and Italians as significant political forces may be of some historical interest and guidance to blacks with political aspirations. But the discriminatory obstacles overcome by those

groups are precedent only for future avoidance of similar discrimination, subtle or overt, against any group, and may not be accepted philosophically as the "dues" minority persons must pay in order to find a place on the political bandwagon.

The *Morgan* litigation documents that Boston's black population has suffered from the unresponsiveness of the School Committee in the area of segregation and with respect to the general quality of available education. But the Committee's lack of responsiveness in meeting its responsibility to provide quality education for the children of Boston has victimized whites as well as blacks, particularly the underprivileged and less fortunate of both races. The record makes clear that some schools in Boston's poor white areas have been, and continue to be, as inadequate as those in the black areas.

Plaintiffs' purpose in pointing out the unresponsiveness of the School Committee to black needs is to highlight a factor which, in combination with others, could warrant the conclusion that the existing electoral process for the School Committee is unconstitutional. Plaintiffs' case does not rest on whether or not the presence of a black on the School Committee will solve the problem of its unresponsiveness.[37] In other words, the fact of unresponsiveness is presented in this case to vindicate the political, and not merely the educational, rights of the black plaintiffs.

Having said this, however, the court must point out the difference between this case, involving the School Committee, and the *White* and *Whitcomb* decisions, which focused on elections to the Texas and Indiana Legislatures. The problem of an unresponsive legislative delegation, as a practical matter, can only be solved through some restructuring of the election process. The responsibilities of legislators are so varied, their discretion so great, and the problems of separation of powers so enormous, that it is hard to conceive of a court supervising, except in relation to very specific issues, the performance of a state legislature.

Court supervision of an elected body having a much narrower function, such as a school committee, is a more manageable operation. The unresponsiveness of Boston School Committees, about which plaintiff complains in this case, is already being dealt with under the close supervision of Judge Garrity. A five-member School Committee having two blacks might still be deemed unresponsive so as to require the same supervision provided for in *Morgan*. The point is that School Committee unresponsiveness is being dealt with by this federal court without the necessity of restructuring underlying electoral procedures.

The record is clear that certain groups have engaged in some racial campaign tactics during recent School Committee elections. Such tactics are despicable in any form and to any degree. It is important to emphasize, however, that campaign tactics that appeal to purely racial animosity have not been dominant. *Graves v. Barnes,* 343 F.Supp. 704, 726 (W.D.Tex.1972), *aff'd sub nom. White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973). While black candidates have been hampered in recent elections by racial attitudes, their lack of success is more readily explained by a) low black voter participation and b) the strong feeling engendered by the busing issue. Both factors have been discussed extensively in sections IV and V of this opinion, and the points made there need not be repeated here.

Racial and ethnic voting patterns, as well as the busing issue, are factors that have combined to cause a degree of bloc voting in some of Boston's School Committee elections. But, in many white sections of the city substantial votes are cast for black candidates. In black areas, while black candidates almost always outstrip white opposition, the total vote for white candidates combined has nearly always exceeded the total vote for black candidates. A major reason for this result is that there are so

---

**37.** From 1961 to 1965, William O'Connor and Arthur Gartland—and particularly the latter— attempted largely in vain to articulate the interests of Boston's black school children.

many more white than black candidates on the ballot, but it does serve to demonstrate that white School Committee candidates are in some degree acceptable to the black community.

Since the issue in this case is an alleged denial of access to the political process, it is important to point out that, despite the relatively low numbers of blacks in Boston and their low registration and voting rates, (see discussion, *supra* V), black candidates have been successful in primary School Committee elections and have run very strongly in the finals. The success of Atkins in at-large City Council elections is also relevant. White candidates supported by the Citizens group have been elected to the School Committee. The success, or near success, of these candidates suggests that, despite some degree of racial bloc voting, the at-large system has not barred blacks from participation in School Committee elections.

This conclusion is supported by analysis of the other factors that the Supreme Court has suggested must be considered in cases such as this.

As a matter of history, Boston has never segregated the races by statute. The contrary has been true in every other case to date in which an at-large system has been held to have been unconstitutional.[38]

The court is aware, as its findings of fact indicate, that Boston's history in terms of its treatment of minorities—and particularly blacks—is far from satisfactory. But the discrimination blacks and other minorities in Boston have suffered, and still suffer, has not extended to barring blacks from the voting booth or the political process. The Massachusetts situation, for example, bears

little relation to *Zimmer*,[39] where for a period of forty years not a single black person had been permitted to cast a ballot. In Massachusetts, blacks have always registered and voted and, indeed, many blacks have been elected to significant public offices.

Boston's at-large election system has none of the characteristics that caused specific concern in *White*. There is no "place" rule which relegates candidates to a certain position on the ballot and injects into the election the worst, and potentially most prejudicial, characteristics of a head to head contest. A candidate is not required to obtain a majority vote to gain a position on the final ballot. Bullet, or single-shot, voting is not prohibited. Government bodies have not placed roadblocks in the way of black candidates and voters but, to the contrary, have affirmatively attempted to facilitate and expand black voter registration and participation.

Representation on the School Committee of black interests, as opposed to blacks actually serving on the Committee, has not been grossly disproportional to the percentage of blacks in Boston's population. Since 1906, Boston's School Committee has consisted of five members. U.S. Census statistics indicate that, as of 1960 the black population of Boston was less than 10%. Despite this, in 1961 and 1963, two white members of the School Committee were elected who ran as part of a black sponsored slate. By 1970, blacks comprised a little over 16% of Boston's population, with a somewhat smaller voting proportion. (*See* Appendix.) In the years since 1970, Boston's black population has reached about 20%. In most of the decided cases holding at-large systems to be unconstitutional, affected blacks have com-

---

38. See note 10, *supra*.

39. *Zimmer v. McKeithen,* 485 F.2d 1297 (5th Cir. 1973) *aff'd on other grounds, sub nom. East Carroll Parish School Board and East Carroll Parish Police Jury V. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976). *See also Wallace v. House,* 515 F.2d 619, 623–24 (5th Cir. 1975), noting that, in Ferriday, Louisiana, very few blacks had been permitted to

register prior to the Voting Rights Act of 1965; and *Beer v. U. S.,* 374 F.Supp. 363 (D.D.C.), *rev'd on other grounds,* 425 U.S. 130, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976), where "[t]he grandfather clause, the literacy standard, the white primary and the 'Segregation Committee' combined *inter sese* and with other techniques to confine black political activity in Louisiana to a self-distressing level." *Id.* at 396.

prised a larger segment of the population. Moreover, in all but two of the School Committee elections since 1961, a black candidate was successful in the primaries and made a relatively strong showing in the finals. In one of the two exceptions, no black candidate ran in the primary.

No quasi-private organization, such as the Dallas Committee for Responsible Government, noted in *White,* holds a veto power over the process of slating and nominating Boston's School Committee candidates. The process is wide open. Anyone who can get 2000 signatures is placed on the ballot for the preliminary election.

Black people do not suffer from the sort of cultural isolation experienced by the Hispanic people of Bexar County. Problems of language and dialect do not obstruct access by most blacks to the mainstream of Boston's political, social and economic life. Beyond this—and again, without underestimating the burdens which a black person still carries in Boston society—it is fair to say that blacks play a vigorous and prominent role in Boston's cultural, political and economic life.

The at-large system has been in effect for a century. It was not instituted as a means for diluting black voting power.[40] Although, in its present form, there is serious question as to whether it is the best system available, there is a rational theory for its use in Boston's School Committee elections. The responsibility for providing quality education for all Boston's school children is a universal, city-wide problem. Those elected should have the well-being of the entire population in mind as they make their decisions. The fact that some may not have lived up to this responsibility may be good cause for removing them from office, but their failure is not adequate cause to suspend the Charter of the City of Boston.

The political history of blacks in Massachusetts has had its success stories as well as its failures. It is discouraging to lose an election, whether one is white or black. But survivors learn from defeat. They come to realize that visibility, credibility and organization are absolute musts for success. An impressive biographical sketch alone has never been enough to insure election for any candidate, white or black. There is an inherent subjectivity in the process by which the majority selects its leaders that defies any computer-like approach to assessing qualifications.

When the burdens placed on ethnic or racial groups reach the level of a constitutional deprivation, as in *Morgan,* a federal court is an appropriate forum for redress. But, after having analyzed the underlying facts in relation to the constitutional standards articulated by the Supreme Court, this court concludes that Boston's century-old at-large voting system for School Committee elections does not violate the rights of the plaintiffs. As a matter of constitutional law, therefore, the present system must stand.

In determining the challenged at-large system to be constitutional, the court in no way endorses it as a matter of social policy. The Constitution embodies the principle that, within certain guidelines, people must be left free to govern themselves. A court is not empowered to strike down laws merely because it may consider them unwise or outmoded. The citizens of Boston have established this election system. They, and their elected leaders, must weigh the social factors that now exist and then determine if its continuation is in the best interest of the City.[41]

40. As noted, *supra* note 5, the court has not examined the issue of whether, as a matter of law, plaintiffs must show that the at-large system *intentionally* discriminates against blacks. Even assuming they do not have to make such a showing, but need only demonstrate an unconstitutionally discriminatory effect, the court finds they have not carried their burden.

41. Boston's public school population as of May 1976 was 41% black. *Morgan v. McDonough,* CA 72–911–G, Memorandum and Orders Modifying Desegregation Plan, Appendix A (D.Mass., May 3, 1976). Several of the defendants in this case have conceded that the lack of black School Committee members has "created a problem in the city." Response of defendant

In accordance with this decision, the court finds in favor of the defendants.[42] An order will issue.

## APPENDIX

Population statistics for the city of Boston, from the decennial census years 1870–1970 are as follows:

|      | Total   | White   | Black   | % Black |
|------|---------|---------|---------|---------|
| 1870 | 250,526 | 247,013 | 3,496   | 1.40    |
| 1880 | 362,839 | 356,826 | 5,873   | 1.62    |
| 1890 | 448,477 | 439,887 | 8,125   | 1.81    |
| 1900 |         |         |         |         |
| 1910 | 670,585 | 655,696 | 13,564  | 2.02    |
| 1920 | 748,060 | 730,485 | 16,350  | 2.19    |
| 1930 | 781,188 | 758,756 | 20,574  | 2.63    |
| 1940 | 770,816 | 745,886 | 23,679  | 3.07    |
| 1950 | 801,444 | 758,700 | 42,744  | 5.33    |
| 1960 | 697,197 | 628,704 | 63,165  | 9.06    |
| 1970 | 641,071 | 524,588 | 104,685 | 16.3    |

The present percentage of black people in the city is estimated at approximately 20%. This percentage must be discounted, however, to compute the percentage of black voters in the population, because the median age of blacks in Boston is about ten years younger than that of the white population. For example, in 1970, while black people comprised some 16.3% of the city's population, the black proportion of voters that year was estimated at trial variously as from 8.14% to 12.96%.

Mayor Kevin White to plaintiffs' request for admission. Tr. 2155.

**42.** The Court's conclusion that the existing election system does not operate to impair the

right of blacks to vote also forecloses plaintiffs' claims under the Voting Rights Act, 42 U.S.C. §§ 1971 and 1973, and under the First Amendment.